THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, v. DUN-
CAN PEDER MCKENZIE, JR., DEFENDANT AND APPELLANT.

No. 13011.
Submitted March 13, 1978.
Decided June 7, 1978.
Dissenting Opinion July 7, 1978.
Rehearing Denied July 25, 1978.
581 P.2d 1204.

Barney Reagan (argued), Cut Bank, for defendant and appellant.

Mike Greely, Atty. Gen. (argued), Helena Michael McCarter, Asst. Atty. Gen. (argued), Helena, Douglas L. Anderson, County Atty. (argued), Conrad, for plaintiff and respondent.

MR. CHIEF JUSTICE HASWELL delivered the opinion of the Court.

Defendant Duncan Peder McKenzie, Jr., was convicted of the crimes of deliberate homicide and aggravated kidnapping by jury verdict in the District Court of Cascade County and thereafter was sentenced to death. The conviction and sentence were affirmed on appeal by this Court. *State v. McKenzie*, (1976), 171 Mont. 278, 557 P.2d 1023.

Thereafter, the United States Supreme Court granted certiorari, vacated this Court's judgment and remanded the cause to us for further consideration in light of *Patterson v. New York*, (1977), 432 U.S. 197, 97 St.Ct. 2319, 53 L.Ed.2d 281. This opinion constitutes the judgment of this Court following remand.

The victim in this case was Lana Harding, a 23 year old rural school teacher in Pondera County, Montana. On Tuesday morning, January 22, 1974, she failed to appear at school. At the Pioneer School teacherage where she lived, the bed was found in a dishevelled condition. The sheriff of Pondera County was called and officers were dispatched to the school, arriving there midmorning.

Investigation that day revealed: (1) A red tennis shoe belonging to Lana Harding just outside the school; (2) a drag trail from the teacherage to a nearby road; (3) blood near the end of the drag trail (later identified as Lana's type and Rh factor); and (4) a wristwatch belonging to Lana in the same area as the blood. Lana Harding was last seen in Conrad, Montana, some 13 miles from the teacherage, on Monday, January 21, at about 5:00 p.m.

Defendant had recently moved into the community and was working for the K & K Wholesale Seed Co. located approximately three miles from the Pioneer School teacherage. A day or so before January 21, he made arrangements to buy a 1948 black Dodge pickup, recognizable to most inhabitants of the area because it had belonged to one local owner for a long period of time. On January 21, defendant had worked on the pickup after work. He was seen leaving K & K Wholesale Seed Co. at approximately 6:45 p.m., heading toward his place of residence (not far from the teacherage) in the black pickup. The pickup was seen about 7:00 p.m. about a mile from the teacherage.

Approximately an hour later, around 8:00 p.m., defendant knocked on the door of the Pearson farm residence, located across the road from the teacherage. He asked for assistance in starting his pickup. It was later determined the pickup was parked in the road at a point where the drag trail ended and where the blood and watch were found the following day. At the Pearson residence defendant asked directions to his own residence and called his wife to say he was coming home. Don Pearson pulled the pickup, got it started, and noted defendant did not drive on toward his place of residence. Shortly thereafter, the pickup was seen being driven toward the drill site where Lana's body was found the following day.

Her body was found clothed only in a shirt, sweater and bra. It was draped over the tongue of a grain drill. She had been severely beaten about the head and body. The forensic pathologist who examined the body testified the death blow had been delivered to the head and laid open the right side. A rope was tied around her neck; there was evidence she had been strangled; however, pressure had been released so she did not die of strangulation. A coil of wire was entangled in her hair, later shown to have come from a roll of wire found in the back of defendant's pickup.

During the search for the body and the investigation of the homicide, three additional items were found: (1) A pair of gloves, worn by defendant at work, were found in a field not far from

where the body was discovered with human blood on them; (2) overshoes with Lana's type blood and brain tissue on them were found about a quarter of a mile away, and impressions from the soles matched the heels of boots later taken from defendant's home; and (3) Lana's purse was found near the place where the overshoes were recovered.

As a result of the investigation by the sheriff and his deputies, the county attorney, on Tuesday afternoon, January 22, filed a complaint charging defendant with assault before the justice of the peace. The county attorney also obtained a warrant for the arrest of defendant and a search warrant.

Defendant was thereafter arrested at his home. The black Dodge pickup was seized and impounded. Human blood was found in the bed of the pickup and on the springs; the back end of the pickup had been recently sprayed with black paint; the spray paint was later identified by FBI experts as identical to a paint brand named "Weekend" which was not available in the Conrad, Pondera County, area. A·can of the black spray paint was found in the cab of the pickup, and another was later found at defendant's home.

The following items were found in the back of the pickup: (1) A coil of wire, later identified as having been the source of the wire found in the victim's hair; (2) an exhaust manifold that had been painted black; and (3) human blood of the same type and Rh factor as Lana's and brain and cortical tissue were found on the manifold. Dr. John Pfaff, who examined the victim's body and the manifold, testified that the manifold could have inflicted the fatal blow.

At the drill site where the body was located, a piece of brass from a water pump was found. The prior owner of the Dodge pickup testified this piece of brass was in the back of the pickup when defendant took possession of the pickup on January 19.

Several co-workers at the K & K Wholesale Seed Co. testified at trial that defendant had said on January 21 that he broke in every new vehicle by engaging in sexual intercourse in each newly acquired vehicle. Several days before defendant had remarked that he had had intercourse with country school teachers; that they were naive, he could teach them, and they were easy to get.

Defendant appealed from the judgment of conviction and sentence imposed. We affirmed. *State v. McKenzie*, supra. The United States Supreme Court, on certiorari, vacated this Court's judgment and remanded the cause to us for further consideration in the light of *Patterson v. New York*, supra.

We have reconsidered the entire case, not only in the light of *Patterson*, but also on all issues raised in the original appeal to this Court. This opinion constitutes this Court's judgment in the entire case following remand.

In the interest of an orderly presentation of the specifications of error raised by defendant, we reorganize and present them insofar as possible in chronological sequence. Although there is some overlap, the issue on appeal generally fall into four categories: (1) Those relating to pretrial proceedings; (2) those involving the trial itself; (3) issues involving post-trial proceedings, including but not limited to, imposition of the death sentence; and (4) issues for reconsideration as remanded from the United States Supreme Court.

Defendant's specifications of error on appeal are:

1. The issuance and execution of the arrest and search warrants without probable cause, including all claims of error flowing therefrom.

2. Errors relating to the District Court's refusal to permit defendant to change his plea and enforce a plea bargain.

3. Denial of defendant's motions for substitution of the trial judge.

4. Permitting the filing of amended Informations against the defendant and matters relating thereto.

5. Denial of a speedy trial to defendant.

6. Denial of defendant's motions for a protective order and the constitutionality of Montana statutes relating thereto.

7. Denying defendant the right to voir dire the jury on legal concepts relating to defendant's mental state.

8. Permitting the State to endorse 58 additional witnesses on the amended Information on the first day of trial.

9. Failure of the State to timely furnish defendant with statements of its witnesses.

10. Improperly admitting in evidence numerous State's exhibits and denying admission in evidence certain proposed exhibits of defendant's.

11. Improperly instructing the jury.

12. Imporper jury verdict forms.

13. Permitting audience recording of the State's closing argument to the jury.

14. Unde interference and partisan attitude by the trial court preventing an orderly and proper presentation of the case.

15. Insufficiency of the evidence to support the verdict.

16. Denial of defendant's motion for a new trial.

17. Errors in the court's "findings, conclusions, sentence and order" resulting in the imposition of the death sentence.

18. On remand from the United States Supreme Court, the issue is whether the trial court's instructions improperly shifted the burden of proof of defendant's state of mind, an essential element of the crimes charged, to defendant in violation of due process under the federal and state constitutions.

In connection with the first issue above, defendant contends: The arrest and search warrants were not issued upon probable cause in violation of United States and Montana constitutional requirements; the facts supporting probable cause were not made under oath or affirmation and reduced to writing in violation of Montana constitutional requirements; the search warrant was either issued as or converted into a prohibited general search warrant; section 95-1806(f), R.C.M.1947, is unconstitutional under the United States and Montana Constitutions; by reason thereof State's exhibits 17, 18, 20, 21, 22, 26, 27, 31, 32, 33, 34, 35, 39 through 52, 83 through 100, and sublettered exhibits bearing any of these numbers are inadmissible as the products of an unlawful search and seizure; and defendant's motions to suppress and objections to these exhibits should have been granted.

We disagree with defendant's contention there was no probable cause for the arrest or search warrant. This Court in *State ex rel. Garris v. Wilson*, (1973), 162 Mont. 256, 511 P.2d 15, considered federal case law and the long standing rule in this jurisdiction on probable cause for arrest and search warrants noting:

" 'We reach this decision by application of the following standards: *only a probability of criminal conduct need be shown.*' "

Far more was shown here. See: *State v. Troglia*, (1971), 157 Mont. 22, 482 P.2d 143; *Spinelli v. United States*, (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637.

Defendant argues the search warrants must fall on the basis of failure on the part of the county attorney to swear or affirm and reduce the testimony to writing. He relies on *State ex rel. Townsend v. District Court*, (1975), 168 Mont. 357, 543 P.2d 193; and *Petition of Gray*, (1970), 155 Mont. 510, 473 P.2d 532. We find neither case factually applicable here.

Article II, Section 11, 1972 Montana Constitution, provides:

" * * * No warrant to search any place, or seize any person or thing shall issue * * * without probable cause, supported by oath or affirmation reduced to writing."

In *Townsend* nothing was reduced to writing. Here, there is an affidavit signed by the county attorney and made a part of both warrants. At a later date, defendant argues the justice of the peace failed to follow the rituals of the swearing. County Attorney Nelson later testified he asked the justice of the peace "if he was sworn."

Defendant argues the county attorney made the affidavit only on facts obtained from Jerry Hoover, a deputy sheriff of Pondera County, who had been at the scene of the crime as part of the investigating team. This is not a true picture of what took place before Justice of the Peace Wolfe at the time the county attorney gave the affidavit and obtained the warrants.

On September 30, 1974, a hearing on the defendant's motion to suppress was held before Judge Robert J. Nelson. Testifying were Sheriff Hammermeister, his deputy Jerry Hoover, Justice of the Peace Robert Wolfe and County Attorney David H. Nelson. The

arguments of defendant's counsel were directed to the lack of probable cause for the issuance of the warrants.

A summary of the testimony shows Justice of the Peace Wolfe testified he customarily swears all witnesses-though he did not recall swearing in the county attorney, he considered him sworn. Deputy Hoover testified he came into town about 4:30 p.m. on January 22, 1974, with directions to go to the county attorney's office; that he helped the county prepare the affidavit and he then went before Justice of the Peace Wolfe and gave sworn testimony in support of the issuance of the warrants. County Attorney Nelson testified he had been at the scene with the sheriff and his deputies during the afternoon and just prior to his coming to town to get the warrants issued. At the hearing, he said in answer to a question as to what knowledge he had of the facts:

"A. Well, without looking at the affidavit now—I think the first paragraph or two is my statement as to what I determined, that she was missing and may have been the victim of foul play but of what nature we didn't know at the particular time, and that she resided at the teacherage."

In addition, the county attorney examined Deputy Hoover before the justice of the peace as to facts he learned during the investigation. Here, unlike *Gray*, there was, in effect, sworn testimony by the county attorney and deputy sheriff in addition to the affidavit, and the combination thereof established probable cause. The fact that defendant had been parked at the roadside near the school the night before had been established by the Pearsons, who assisted defendant in getting the truck moved. It was there the victim's watch was found in a pool of blood by the investigating officers before going to town to get the warrants. See: *Lindley v. State*, (1956), Okl.Cr., 294 P.2d 851.

This, in our opinion, is a sufficient showing of probable cause to issue the warrants.

■■■ Defendant next attacks the specificity of the search warrant, alleging that under the search warrant issued, a blanket seizure resulted. Examination of the warrant indicates that both

the house and the vehicle were to be searched. Though an error on the vintage of the black Dodge pickup (1950 instead of 1948) appeared, that is of little significance. *State ex rel. Flournoy v. Wren*, (1972), 108 Ariz. 356, 498 P.2d 444. All parties knew the pickup involved. All that is needed to meet the requirements of specificity is that the officer with reasonable effort, can ascertain the automobile intended to be searched, and its owner, if possible. *Wangrow v. United States*, (8th Cir. 1968), 399 F.2d 106. Defendant cites case authority that some seven criteria are needed for identification of a motor vehicle—owner, make, model, year, color, motor number and license number. Here, the affidavit for the search warrant answers five of the seven listed criteria and it was sufficiently specific. *Wilkerson v. Commonwealth*, (1923), 200 Ky. 399, 255 S.W. 76; *Hatley v. State*, (1941), 72 Okl.Cr. 69, 113 P.2d 396.

■ Defendant's argument that the items seized were not covered by the language "any other contraband articles" is without merit. The language used comes within the rule of *State v. Quigg*, (1970), 155 Mont. 119, 467 P.2d 692, where we held that items other than those specifically described in the search warrant may be seized as long as a reasonable relationship is demonstrated between the search authorized in the warrant and seizure of the items not specifically described therein.

■ Nest we consider the constitutionality of section 95-1806(f), R.C.M.1947, which states:

"The burden of proving that the search and seizure were unlawful shall be on the defendant."

We find no merit in defendant's contention this subsection is unconstitutional. We note defendant cites no authority for his position and therefore fails to overcome the presumption of constitutionality. *United States v. Keleher*, (1924), 55 App.D.C. 132, 2 F.2d 934, relied upon by defendant, is not applicable to the facts here. We note that Montana's statute section 95-1806(f), R.C.M. 1947, is patterned after Chapter 38, § 114-12(b), Ill.Code of Criminal Procedure, which states in part:

"* * * The Judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were unlawful be on the defendant * * *."

Here, such a hearing was held by the trial court, and defendant failed in his effort. *People v. Normant*, (1975), 25 Ill.App.3d 536, 323 N.E.2d 553; *State v. Tritz*, (1974), 164 Mont. 344, 522 P.2d 603.

Defendant next specified reversible error arising out of an alleged "plea bargain", an alleged breach thereof by the State, a refusal by the District Court to specifically enforce the terms thereof, and a refusal by the District Court to permit the defendant to withdraw his prior plea and substitute a plea of guilty in conformity with the alleged plea bargain.

In substance the defendant contends that a valid and binding agreement was made on December 22, 1974, between the prosecutor and defense counsel, subject to approval by the trial judge, that defendant would plead guilty to deliberate homicide and aggravated assault and would receive sentences of 50 years and 20 years respectively to be served concurrently. Defendant claims that on the following day counsel met with the trial judge, who with some reluctance, agreed to all aspects thereof (except that he felt he could only give one 50 year sentence for both crimes) and set December 30 as the date for change of plea and entry of judgment in accordance with the agreement. As a result, according to defendant, defense counsel agreed to explain what problems they foresaw in the prosecution of the State's case and what the defense position would have been had the case gone to trial, all to counteract anticipated public reaction by the sheriff and the family of the victim.

On December 28 the prosecutor advised defense counsel they would not perform their part of the plea bargain agreement, according to defense counsel. On December 30 the District Court denied defendant's motion to withdraw his plea and refused to enforce the alleged plea bargaining agreement.

The State, on the other hand, denies that any plea bargaining agreement was entered into on December 22, or at any other time.

The State contends the initiation and impetus for the plea bargaining discussions came from the defendant; that throughout the discussions the State consistently took the position that no plea bargain could be entered into without the consent of the victim's family and the sheriff; and that the only reason the State agreed to meet with the trial judge and defense counsel on December 23 was that the prosecution was unable to travel some 400 miles to see the victim's family until December 26. Because no consent could be obtained from the victim's family, no further plea bargaining discussions were held. The State asserts any gratuitous information that defense counsel believed they had imparted to the State was either already known to the State or of no significance to the prosecution's case.

The issue turns on the existence of the alleged plea bargaining agreement. The trial judge accepted the State's version of the situation and refused to enforce the alleged agreement contended for by defendants. We likewise accept the State's version. We hold that where, as here, the existence of any plea bargaining agreement was disputed and there is substantial evidence that none was made, there is nothing to enforce and the trial court's actions in this regard were correct.

As we understand it, there is neither contention nor proof of bad faith by the State in its discussions with defense counsel on a plea bargain or in its effort to secure the approval of the sheriff or the victim's parents. Under these circumstances any statements of defense counsel concerning weaknesses in the State's case or defense positions in connection therewith were gratuitous and premature. In any event, a trial is not a sporting contest in which the verdict turns on nondisclosure of such matters. Discovery procedures are designed and operated to remove this element and had been extensively and exhaustively utilized at the time in question.

*Santobello v. New York*, (1971), 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427, does not aid the defendant here as that case is clearly distinguishable on the facts and on the law.

Defendant's next specification of error concerns the denial of his

motions for substitution of the trial judge. He argues that he attempted to disqualify the trial judge for cause by motion and hearing on September 30, 1974, on the basis that the trial judge was a member of the Criminal Law Revision Commission that drafted Montana's present Criminal Code and submitted it to the legislature for enactment. He argues that he again attempted to disqualify the trial judge for cause on December 30, 1974, first, because the trial judge had acquired information during the plea bargaining process making for him to sit in an impartial manner, and second, because he was attempting to force his own "Preliminary Instructions to the Jury" over both prosecution and defense objections which indicated he had assumed an adversary stance and taken over prosecution of the case.

We hold that the trial judge's membership on the Criminal Law Revision Commission did not per se constitute grounds for disqualification for cause. Canon 4 of the American Bar Association Canons of Judicial Ethics specifically permits this: "A Judge may engage in activities to improve the law, the legal system, and the administration of justice." The draft of the revision of the Criminal Code by the Commission was presented to the legislature for its consideration, approval, rejection or modification.

Nor do we find any ground for disqualification of the trial judge for cause in his acquisition of information during the plea bargaining process, his drafting of "Preliminary Instructions to the Jury", or any facts or proof that he had assumed an adversary position at trial in taking over the prosecution of the case. The rule of *United States v. Grinnell Corp.*, (1966), 384 U.S. 563, 86 S.Ct. 1698, 15 L.Ed.2d 778, is inapplicable to establish bias and prejudice. Here, whatever knowledge the trial judge obtained was during the course of legal proceedings in the case and not from any outside source. As long as the trial judge's "Preliminary Instructions to the Jury" are a correct statement of the law, it is immaterial whether they are drafted by the judge or given over the objections of one or both adversary counsel. Such is the case here for reasons hereafter discussed. Finally, we find the record does not

support defendant's contention the trial judge assumed an adversary role and took over the prosecution of the case.

Defendant argues as error the District Court's rulings permitting the State to file amended Informations against him. We need only concern ourselves with the filing of the third amended Information as it was this Information on which defendant was ultimately tried. The third amended Information conforms to our opinion and directions in *State ex rel. McKenzie v. District Court*, (1974), 165 Mont. 54, 525 P.2d 1211. Thus, there is no error in the affidavit, the Information, or the District Court's rulings in permitting its filing.

Defendant complains he was denied a speedy trial, emphasizing a lapse of 350 days between arrest and trial. This delay cannot be considered per se a violation of defendant's right to a speedy trial. However, the length of time between defendant's arrest and trial does shift the burden of explaining the reason for the delay and showing absence of prejudice to defendant upon the prosecution. *Fitzpatrict v. Crist*, (1974), 165 Mont. 382, 528 P.2d 1322; *State v. Keller*, (1976), 170 Mont. 372, 553 P.2d 1013. The State's explanation for the delay was defendant's several appearances in this Court, the difficulties arising from the defendant's refusal to plead, and the difficulties which arose because this was the first homicide prosecuted under the new Montana Criminal Code and under the new capital punishment scheme. Much of the time can in fairness be charged to neither party, but it is clear that it aided both parties to better prepare for trial, this being a complex circumstantial case. Under those circumstances, we cannot see that defendant was denied his right to a speedy trial. The State's explanation of the delay is satisfactory and shows that defendant was not prejudiced by the length of time between arrest and trial.

Defendant contends the Montana provision for notice of mental defect or disease and the mental defect or disease provisions in the Code of Criminal Procedure, sections 95-501 through 509 and section 95-1803(d), R.C.M.1947, are unconstitutional. To

challenge the constituionality of these sections, defendant sought a protective order to protect himself from any waiver of rights were he to give the notice required by these sections. The court denied the relief sought and held these sections to be constitutional and not violative of the United States or Montana Constitutions. On appeal, defendant maintains the court erred in not holding these provisions unconstitutional.

Defendant's constitutional arguments were previously answered by this Court in *State ex rel. Sikora v. District Court*, (1969), 154 Mont. 241, 462 P.2d 897. Defendant's attack on these statutes loses much of its force when it is recognized that the United States Supreme Court promulgated, and Congress, after careful consideration, approved Rule 12.2, Federal Rules of Criminal Procedure, Notice of Defense Based upon Mental Condition, which is nearly identical to the procedure attacked here. It should be emphasized that the purpose of the statute is for notice, to prevent surprise, and to eliminate the necessity for a continuance of a trial when the defense is raised. The fact of notice does not amount to a plea, and it could not be used in any way as evidence in a trial on the merits. The provisions merely provide for advance notice of the intent to rely on such defense so that the State may be prepared to meet this defense.

Defendant claims prejudice because he was not allowed to voir dire the jury on the subject of mental disease or defect. This Court has previously said that where notice of a defense of mental disease or defect is given, a refusal to allow defendant to voir dire the jury on this defense constitutes prejudicial error. *State v. Olson*, (1971), 156 Mont. 339, 480 P.2d 822. Here, defendant did not give any notice. We believe defendant was properly not allowed to voir dire the jury on mental disease or defect as he did not give any notice of this defense.

Defendant also alleges the addition of the names of 58 new witnesses to the amended Information on the day of trial was error.

The pertinent section of the Code of Criminal Procedure is section 95-1803(a)(1), R.C.M. 1947, which reads:

"(a) List of Witnesses:

"(1) For the purpose of notice only and to prevent surprise, the prosecution shall furnish to the defendant and file with the clerk of the court at the time of arraignment, a list of the witnesses intended to be called by the prosecution. The prosecution may, any time after arraignment, add to the list the names of any additional witnesses, upon a showing of good cause. This list shall include the names and addresses of the witnesses."

The Revised Commission Comment on this section points out:

"Section 95-1503(d) of Chapter 15 requires the state to endorse the names of the witnesses for the state on the indictment or information under this section permits the defendant to get a list at any time, probably after arraignment and before trial. Many times the state does not know before it files the indictment or information all the witnesses it may call.

"Further, this provision allows the addition of names not only prior to trial, but after the trial has commenced. As the trial progresses, the showing which is necessary to establish 'good cause' should be more stringent. At any time, the judge may allow a continuance (section 95-1708) if it should appear necessary in the interest of justice.

In *State v. Campbell*, (1972), 160 Mont. 111, 500 P.2d 801, the person whose name was added was the victim of the assault and the Court there found no serious claim of surprise and pointed out that while defendant objected, he made no effort to ask for a continuance. In *State v. Rozzell*, (1971), 157 Mont. 443, 486 P.2d 877, the District Court judge recognized the possibility that the witnesses added would surprise the defendant and offered to continue the trial until the defendant had had a chance to interview all the new witnesses, but this was refused.

■■■ These cases clearly indicate that the proper procedure where surprise is claimed from the addition of new witnesses is to ask for a continuance so that defendant may prepare. In the present case, defendant objected to the addition of the witnesses based on surprise and inability to prepare his defense, but never requested a

continuance. The District Court in granting the State's request for the addition of the new witnesses cautioned:

"* * * and in granting this motion, it must be understood before any of these witnesses is allowed to testify, the defendant must be given an opportunity to have his counsel talk with them, examine them * * *."

The witnesses added were not prejudicial to defendant. The addition of the names of the FBI agents did not surprise defendant, as he knew the content of their testimony from reports received several months earlier. The rest of the additional witnesses who were actually called to testify were employees of Wright Chevrolet. These persons' testimony was a part of the chain of possession of the evidence seized from the truck. The remainder of the witnesses whose names were added, but who were not called to testify, were named because they could, if need be, corroborate the testimony of the already listed witnesses, lay further foundation, or testify about the weather and temperature in the area on the dates in question.

In its order the court was careful to provide defendant with protection against surprise and to ensure that defendant was able to prepare for the testimony. Defendant was in no way prejudiced by the addition of these witnesses. Before allowing the addition of the new witness names, the court examined the county attorney to determine the reason for the addition of each new witness and to find out the nature of each of the witness' testimony in the presence of defendant's counsel, so that defendant was apprised of the basic nature of the testimony.

Defendant contends the State failed to timely furnish him with statements of its witnesses. He argues that this is reversible error.

Sections 95-1801(d)(2) and 95-1804(a), R.C.M.1947, provide the basic discovery tools. Section 95-1804(a). R.C.M.1947, provides:

On motion of a defendant in any criminal case made prior to trial the court shall order the state to furnish the defendant with a copy of any written confession or admission and a list of the witnesses to its making. If the defendant has made an oral confes-

sion or admission a list of the witnesses to its making shall be furnished."

This section by its mandatory language entitles defendant as a matter of right upon motion, to statements he made. It requires no showing of good cause.

Section 95-1801(d)(1), provides:

"Upon motion of either party and upon showing of good cause, the court may issue a subpoena prior to the trial directing any person other than the defendant to produce books, statements, papers and objects prior to the trial or prior to the time when they are to be offered in evidence and the court may, upon their production, permit the books, statements, papers or objects or portions thereof to be inspected, copied, or photographed by the parties and their attorneys."

The Revised Commission Comment discussing this section points out:

"The discovery allowed under subsection (d) is a two-part mechanism for gathering information. Under paragraph (1) either party may require a third person, other than the defendant, through the use of a subpoena (section 93-1501-3), to produce certain articles. The only restriction is that good cause must be shown. This allows what is sometimes referred to as a 'fishing expedition'—but only where third parties are concerned."

Section 95-1801(d)(2), provides:

"Upon motion of the defendant, within a reasonable time before trial, the court may, upon a showing of good cause, at a time and place designated by the court, order the prosecution to produce prior to trial for inspection, photographing or copying by the defendant, designated books, statements, papers, or objects obtained from defendant or others by the prosecution which are material, relevant and necessary to the preparation of the defense case."

The Revised Commission Comment discussing this provision states:

"The second paragraph permits discovery by the defendant or the prosecution with the additional requirement that the object

desired must be 'material, relevant and necessary to the preparation of the case."

This comment indicates the showing necessary to get access to material in the hands of the prosecutor is greater than that required to get material in the hands of third parties.

Against this background, and with the recognition that in most criminal cases in Montana discovery is conducted on a more informal basis without resort to the motion and hearing procedures outlined above, this Court finds the allegation of error based on a delay of approximately one week in complying with the demand made by defendant after trial had begun, to be without merit.

Defendant claims he had made two prior demands upon the county attorney for this material. These demands were in the form of letters to the county attorney. Defendant made a number of specific requests and then made a general request for "* * * copies of any documentary or physical items which you will rely on for proof of any fact * * *." The second letter expressed defense counsel's opinion that the State was not going to provide the requested information. This letter was dated, August 20, 1974. On January 13, 1975, after trial began, defendant filed a demand and motion requesting that all statements taken by the prosecution from all witnesses be turned over to defendant and demanding immediate compliance. Any delay in the prosecution's furnishing defendant with the material requested in his earlier letters was waived by defendant's failure to file a demand and motion for this material until after trial had begun.

Even though the demand and motion was not made "within a reasonable time before trial", as required under section 95-1801 (d)(2), the court granted the motion saying:

"Before a witness takes the stand, other than your foundation witnesses, that you [the State] are proceeding with now, furnish them [defense counsel] with such copies as you have that are not your work product as such, and before they [the witness] take the stand, he is going to be given an opportunity to talk with each witness, particularly those that have been endorsed just the other day * * *."(Bracketed material added.)

The time it took for the State to gather, sort, and copy the requested material during the presentation of the State's case-in-chief was reasonable. The court prevented any prejudice by allowing defendant to interview the witnesses prior to their taking the stand. We note the State complied with the specific requests made by defendant in the August letters, and the reports received from the FBI and the autopsy report were forwarded to defendant soon after they were received and prior to the August requests.

Defendant objects to certain photographs which were introduced into evidence as being gruesome and inflammatory or otherwise prejudicial.

The basic rule on photographic evidence in Montana as stated in *State v. Campbell*, (1965), 146 Mont. 251, 261, 405 P.2d 978, 984, is:

"* * * Photographs are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case. *Fulton v. Choteau County Farmers' Co.*, 98 Mont. 48, 37 P.2d 1025. When the purpose of an exhibit is to inflame the minds of the jury or excite the feelings rather than to enlighten the jury as to any facts, it should be excluded. *State v. Bischert*, 131 Mont. 152, 308 P.2d 969 * * *."

Here, the photographs in question fall into three categories: (1) Photographs of the body taken at the "drill site"; (2) autopsy photographs taken by the pathologist; and (3) a single photograph of a can of spray paint in a suitcase.

In each instance these photographs meet the above test. They were relevant, useful, and necessary in explaining the evidence and assisting the court and jury in understanding the case. (1) The photographs taken at the site where the body was found were used by the pathologist to show creases in the body which were not present after the body had been moved and which tend to show how long the body had been at the site. (2) The autopsy photographs taken in color and then printed in black and white, were used by the pathologist to show the nature of the wounds and explain the evidence which formed the basis of his opinion as to the

size and configuration of the weapon which was used to inflict the wounds. (3) The photographs of the can of spray paint in the suitcase was used to show the defendant had in his possession a type of paint which was not available in local stores. Defendant finds prejudice from this photograph in the implication of flight that could arise from the fact the paint was in a suitcae. However, defendant had been in custody for some time prior to the time these photographs were taken. This alleged prejudice could have been easily explained away in cross-examination. There was no intent to excite feelings with this photograph which was in no way gruesome. It was properly admitted.

Defendant also objects that certain expert opinion was allowed to be given prior to the completion of the chain of possession of the evidence upon which this opinion was based. This opinion was based. This opinion evidence was given by FBI agents who were witnesses for the State. The judge allowed them to give their opinion as to the evidence they had examined, which had not as yet been admitted in evidence, because there was a portion of the chain of possession which had not been established. It is within the discretion of the court to allow opinion to be given, conditioned on the subsequent production and admission of the evidence which forms the basis of the opinion. *Risken v. Northern Pac. Ry.*, (1960), 137 Mont. 57, 350 P.2d 831; *Graham v. Rolandson*, (1967), 150 Mont. 270, 435 P.2d 263. The chain of possession of the evidence was later supplied. Thus no error was committed.

Next defendant complains that a number of his proposed exhibits were refused admission into evidence. Our examination of the record reveals that these exhibits were refused on the basis of lack of a proper foundation. The rule is that the determination of whether a proper foundation has been laid for the introduction of exhibits into evidence rests with the trial court, and its determination will not be overturned on appeal unless there is a clear abuse of discretion. *State v. Olsen*, (1968), 152 Mont. 1, 445 P.2d 926. In this case, we cannot say the trial court abused its discretion in not admitting defendant's exhibits into evidence. Defendant's argument is without merit.

Defendant contends the extensive preliminary instructions given by the court were erroneous, that it was error to give them prior to the introduction of evidence and that the remaining instructions given after the presentation of evidence were wrong.

The preliminary instructions were the usual instructions given on the role of the jury. In addition, included were a number of instructions which set out the elements of the various crimes of which defendant was accused, and set out statutory definitions of terms used.

Montana's criminal code is written in clear plain language which serves well as the basis for instructions to the jury. There was no error in incorporating the entire Information into the preliminary instructions, for it too is basically in statutory language merely inserting defendant's name and the victim's name in the proper places and enumerating the weapons used. The language is not inflammatory but is as neutral as language detailing the charges involved here can be. Examination of the instructions defining reasonable doubt and the burden of proof show proper statements of the law.

Defendant asserts that language in the instruction which defines the degree of proof necessary as being that which convinces the mind "to a moral certainty of the truth of the charge, no more and no less" falls into the type of error found in *State v. Taylor*, (1973), 163 Mont. 106, 515 P.2d 695. In *Taylor*, the State's burden was defined using the phrase "only such proof as may" which impliedly limits consideration of some of the evidence and which could be interpreted to limit the burden of proof. Here, the nature of the subjective judgment to be made by the jurors is set forth, and the language "no more and no less" merely emphasizes the nature of the judgment and in no way diminishes it.

The Court finds no error to the prejudice of defendant from the fact that extensive preliminary instructions were given prior to the introduction of evidence in the case. Defendant concedes that section 95-1911, R.C.M.1947, gives the court the power to vary the order of trial set out in section 95-1910, R.C.M.1947,

for good reasons. The present case was built entirely on circumstantial evidence. Some of the counts charged were complex and difficult to understand. For example, the second homicide count was a felony homicide which had as alternative felonies, sexual intercourse without consent and aggravated assault. The aggravated assault alternative had alternate aggravating factors, serious bodily injury or bodily injury with a weapon, and a listing of alternative weapons, a rope or a heavy object. It was for good reason that the judge instructed the jury as to the basic elements of all the offenses charged, so the jury could have some understanding of the complex circumstantial evidence to be presented. In a less complex case which was not based only on circumstantial evidence, such preliminary instructions might not be necessary and there would be the required good reasons for varying the usual order of the trial, but here it was acceptable to do so.

 One of the preliminary instructions to which defendant objects is the one defining torture. The instructions states:

"Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so assaulted for the particular purpose of enabling the assailant to either:

"(a) extort anything from such person;

"(b) or to persuade such person against his or her will, or

"(c) to satisfy some other untoward propensity of the assailant * * *."

The term "untoward propensity" is defined in the same instructions as menaing "any perverse, wrong, bad or corrupt inclination or tendency." Defendant maintains that this instruction incorrectly defined torture.

A number of California cases have adopted a similar definition of torture. *People v. Daugherty*, (1953), 40 Cal.2d 876, 256 P.2d 911, 917 states:

"Murder is perpetrated by torture 'when "the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity." *People v. Tubby*, 34 Cal.2d 72,

77, 207 P.2d 51, 54; *People v. Bender*, 27 Cal.2d 164, 177, 163 P.2d 8.' *People v. Martinez*, 38 Cal.2d 556, 561, 241 P.2d 224, 227."

The language of the instruction proposed by defendant is an exact quotation from the opinion of an earlier California case, *People v. Heslen*, (1945), 163 P.2d 21, 27. See: 27 Cal.2d 520, 165 P.2d 250. That case dealt with the sufficiency of the evidence to support a finding of murder by torture and while there is no real conflict between the two instructions, the one given by the court is in the general language which does not comment on the evidence, which breaks the elements down, and which sets the various purposes out in the alternative is a clearer and more understandable statement of the law. The instructions given is a proper one and certainly the better of the two proposed instructions. *People v. Wiley*, (1976), 18 Cal.3d 162, 133 Cal.Rptr. 135, 554 P.2d 881.

The District Court read 28 "Preliminary Instructions to the Jury" prior to trial. After trial, the court read Instructions 29 through 53, denominated "Additional Instructions". These instructions detailed the mental elements of each offense charged and instructed the jury regarding how these elements could be inferred or presumed from proven facts. The courts also defined direct evidence, circumstantial evidence, inferences and presumptions and added additional instructions pertaining to evidence and credibility of witnesses. Instruction 30 stated that defendant is presumed sane, and Instructions 53 detailed the affirmative defense of disease or defect.

Defendant contends the use of statutory inferences and presumptions in the instructions was error and effectively shifted the burden of proof on the issue of intent to defendant.

In general, three statutory inferences, and presumptions used in the instructions are in dispute. The presumptions that an unlawful act was done with an unlawful intent, and that a person intends the ordinary consequences of his voluntary act, were included in Instruction 33 ("Method of Proof Applicable to Sexual Intercourse Without Consent") and 38 ("Method of Proof Applicable to the Of-

fense of Aggravated Assault"). Section 93-1301-7(2), (3), R.C.M.1947. The inference in a deliberate homicide of knowledge or purpose from the fact the accused committed a homicide in the absence of circumstances of excuse, justification or mitigation appeared in Instruction 33. Section 95-3004(2), R.C.M.1947.

As an example of how these inferences and presumptions were explained to the jury, Instruction 33(I) and (II) is set out:

*"Method of Proof Applicable to the Offense of Deliberate Homicide*

"The mental state accompying the voluntary act required for the offense of deliberate homicide being either knowingly or purposely and not requiring in addition thereto that the act be committed for a particular purpose, proof of the mental state may be made by the use of either inferences or presumptions, or by the use of both inferences and presumptions.

"I. *Proof of Mental State by Inference.*

"If you find from the evidence beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, in the commission of a voluntary act, caused by death of Lana Harding, you are permitted from that fact alone to deduce or reason that he did so either knowingly or purposely, if no circumstances of mitigation, excuse or justification appear in the evidence.

"You will be instructed on mitigation, excuse and justification if such instructions are needed.

"In addition to the fact of death being voluntarily caused by the accused, you may, and are instructed to also consider all the facts and circumstances connected with said death, that have been proved in the evidence in determining whether or not the defendant acted either knowingly or purposely.

"II. *Proof of Mental State by Presumptions.*

"(1) If you find beyond a reasonable doubt that the defendant, on about January 21, 1974, in Pondera County, Montana, voluntarily committed an illegal act on Lana Harding, such as

assaulting or injuring her, the law presumes that an unlawful act was done with an unlawful intent; that is, the law expressly directs you to reason from such unlawful act that the defendant acted with an unlawful intent, or purpose.

"This is a rebuttable presumption, which means it may be controverted and overcome by other evidence, but whether or not a presumption, once it has come into effect is overcome, is for the jury to determine.

"(2) The law also presumes that a person intends the ordinary consequence of his voluntary act.

"Therefore, if you find beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, voluntarily and unlawfully assaulted or injured Lana Harding, and if you further find beyond a reasonable doubt that the death would result as the ordinary consequence of such an assault or injury, the law presumes that, and expressly directs you to reason therefrom that the defendant intended to cause said death regardless of whether or not he actually had such an intent or purpose.

"This also is a rebuttable presumption capable of being controverted and overcome, but once it has come into effect it is for the jury to determine whether or not it has been rebutted."

 Defendant initially argues that *Patterson v. New York*, supra, and *Mullaney v. Wilbur*, (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed2d 508, stand for the proposition that intent, as an element of the offense, may never be established by the use of presumptions. We disagree. The Supreme Court noted in *Patterson*:

"*Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant *by presuming that ingredient upon proof of the other elements of the offense.* * * *" 432 U.S. 215, 97 S.Ct.2330. (Emphasis added.)

 Thus, an element of the offense may not be presumed merely by proof of the remaining elements. Elements of the offense may still be presumed or inferred, however, from proof of other

facts, if the relationship between such proved facts and the facts presumed comports with the due process standards announced in *Barnes v. United States*, (1973), 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed2d 380. See, *State v. McBenge*, (1978), 175 Mont. 362, 574 P.2d 260. The use of presumptions and inferences was recognized in a footnote to the majority opinion in *Mullaney*;

"* * * Generally in a criminal case the prosecution bears both the production burden and the persuasion burden. In some instances, however, it is aided by a presumption, see *Davis v. United States*, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895) (presumption of sanity), or a permissible infrence, see *United States v. Gainey*, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965) (inference of knowledge from presence at an illegal still). These procedural devices require (in the case of a presumption) or permit (in the case of an inference) the trier of fact to conclude that the prosecution has met its burden of proof with respect to the presumed or inferred fact by having satisfactorily established other facts. Thus, in effect they require the defendant to present some evidence contesting the otherwise presumed or inferred fact. See *Barnes v. United States*, 412 U.S. 837, 846 n. 11, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973). Since they shift the production burden to the defendant, these devices must satisfy certain due process requirements. See e. g., *Barnes v. United States*, supra; *Turner v. United States*, 396 U.S. 398, 90, S.Ct. 642, 24 L.Ed.2d 610 (1970).

"In each of these cases, however, the ultimate burden of persuasion by proof beyond a reasonable doubt remained on the prosecution. * * *" 421 U.S. 703, n. 31, 95 S.Ct. 1891.

Our inquiry therefore is twofold: (1) Whether the inferences and presumptions in question satisfy the due process standards announced in *Barnes*; and (2) whether the cumulative effect of these instrucitons shifted the ultimate burden of persuasion on the issue of intent to defendant.

The Supreme Court in *Barnes* considered the relationship between the proven fact and the inferred or presumed fact that is required by due process and concluded:

"* * * What has been established by the case, however, is at least this: that is a statutory inference submitted to the jury as sufficient to support conviction satisfies the reasonable-doubt standard (that is, the evidence is sufficient for a rational juror to find the inferred fact beyond a reasonable doubt) as well as the more-likely-than-not standard, then it clearly accords with due process." *Barnes*, 412 U.S. 843, 93 S.Ct. 2362.

The presumptions that an unlawful act was done with unlawful intent, and that a person intends the ordinary consequences of his voluntary act, have been a part of Montana law since 1895. This Court has previously approved the use of these presumptions in criminal cases on the issue of intent. *State v. Caryl*, (1975), 168 Mont. 414, 426, 543 P.2d 389; *State v. McLeod*, (1975), 131 Mont. 478, 489, 311 P.2d 400, 407. See also, *State v. Jones*, (1963), 143 Mont. 155, 181, 387 P.2d 913. The conclusions drawn through the use of these presumptions are generally fair and reasonable ways to ascertain intent, which, of course, can never be proved directly. The instructions emphasized that the "unlawful act" proven must have been voluntary. We believe a rational juror would find beyond a reasonable doubt that a voluntary, unlawful act was done with an unlawful intent, and with an intent to cause its ordinary consequence.

The inference of knowledge or purpose in a deliberate homicide from the fact that the accused committed a homicide and that there are no circumstances of excuse, justification or mitigation is contained in section 95-3004(2), R.C.M.1947. This statute was passed in 1973, at the same time the criminal code introduced the mental elements of knowledge and purpose. In order to qualify for the instructed inference that defendant acted purposely or knowingly, the State was still required to prove: (1) A voluntary act; (2) causing the death of the victim; and (3) absence of circumstances of excuse, justification or mitigation. The instruction emphasized the death must have been "voluntarily caused by the accused". This inference clearly comports with the "reasonable doubt" standard.

▮ Defendant argues the cumulative effect of these presumptions and inferences shifts the burden of proof on the intent issue to defendant. It is well established that challenged jury instructions must be viewed in the context of the entire charge. *Cupp v. Naughten*, (1973), 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368; *State v. Farnes*, (1976), 171 Mont. 368, 558 P.2d 472; *State v. Bosch*, (1952), 125 Mont. 566, 574, 242, P.2d 477. Defendant argues these presumptions and inferences gave the jury the impression that defendant must prove lack of intent. He fails, however, to consider that the following countervailing instructions were also given to the jury:

(1) That defendant denied every material allegation in every count by his plea, and therefore every material allegation must be proved beyond a reasonable doubt;

(2) That defendant is presumed to be innocent, and his guilt must be proven beyond a reasonable doubt;

(3) That the jury may not convict on possibilities, conjecture or surprise, but only on evidence establishing guilt beyond a reasonable doubt;

(4) The statutory definitions of the mental elements, "purposely" and "knowingly";

(5) A statement of the elements of the offenses charged, including the mental elements;

(6) A re-emphasis (in the "Additional Instructions") of the mental states required for each offense, and a re-emphasis of the requirements of a voluntary act; and

(7) Warnings that the presumptions noted may never be used to prove the particular purpose that are elements of the offenses of deliberate homicide by means of torture and aggravated kidnapping.

When read in their entirety, the instructions can only be interpreted to mean that the State had the burden of proving every element of the offense beyond a reasonable doubt. The use of the presumptions and inferences merely set forth, in terms entirely consistent with Montana law, how the State could meet this burden by proof of objective facts.

312

We are aware of the recent decision in Oregon that to instruct the jury on the presumption of unlawful intent arising from an unlawful act constituted an unconstitutional shifting of the burden of proof on the element of intent from the state to defendant. *State v. Anderson*, (1978), 33 Or.App. 43, 575 P.2d 677. However, we reject the reasoning of that case. In that case, unlike this one, "* * * the instructions, taken as a whole, were not clear on the issues of intent or burden of proof." *Anderson*, 575 P.2d 679. Here, the instructions on intent and burden of proof were clear and the jury was not misled by them.

In the context of this case, even if the instructions had erroneously shifted the burden of proof on the issue of intent to defendant, we question whether reversal would be required. Such an error could not have affected the jury's determination that it was defendant who caused the death of the victim. Evidence of the perpetrator's intent is overwhelming. The evidence we detailed in the beginning of this opinion about the cause of death, the defendant's behavior on the days prior to the attack, and the facts and circumstances following the attack, all show that defendant acted "purposely" or "knowingly".

A psychiatrist, Dr. Robert Wetzler, testified for the defense that if defendant did the acts charged in the Information, he suffered from such a mental disease or defect that he could not have acted "purposely" or "knowingly". This testimony must be considered in light of the fact that Dr. Wetzler made no inquiry into defendant's actions or statements on the night of the attack or the two days immediately preceding it, although he admitted that such factors could have some bearing upon defendant's mental capacity when the offense was committed. Another psychiatrist, Dr. M.F. Gracia, and a psychologist, Dr. Edmund W. Shubat, both expressed the opinion that defendant did have capacity to act "purposely" or "knowingly".

Furthermore, taking into account all the evidence, we are convinced beyond a reasonable doubt that defendant acted "purposely" or knowingly" and therefore, even if there was any error in the

burden of proof, it was harmless. *Chapman v. California*, (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705.

Defendant goes on to claim error because his instructions were not given. This argument must fail. Defendant's instructions on mental state and mental disease and defect misstate the law, and the instructions on the elements of the crimes charged add an element that is not required.

We have carefully examined the court's instructions and find them proper. The court's instructions as a whole correctly state the law.

■ The next argument defendant raises is that the verdict forms provided to the jury did not cover all possible verdicts and that they amount to special verdicts.

Defendant submitted instructions and verdict forms which covered the offenses of mitigated deliberate homicide and unlawful restraint. It is clear, as stated in *State v. Gray*, (1968), 152 Mont. 145, 153, 447 P.2d 475, 479:

"* * * 'The submission of a lower offense is justified only when the evidence on some basis would support a finding that the defendant is innocent of the higher offense and guilty of the lower.' * * *"

See also: *State v. McDonald*, (1915), 51 Mont. 1, 149 P. 279; *State v. Baugh*, (1977), 174 Mont. 456, 571 P.2d 779. In this case there was no such evidence and the instructions and verdict forms on the lesser offenses were properly not given.

■ Defendant claims error in that the verdict forms submitted to the jury were special verdicts. He argues that Montana law does not allow for specific factual findings by the jury.

The jury was given general verdicts asking for a finding of guilty or not guilty on each count. The jury was to make the additional finding that the element necessary for the imposition of the death penalty was present. Under those circumstances, this additional factual finding does not fall into the vice of a special verdict. It does not require a fact determination which could be used to undermine the general verdict. Thus, the verdict forms were permissible.

Defendant claims prejudicial error in the court's permitting the audience to tape record the State's closing argument to the jury. He contends this prejudiced his right to a fair trial. His argument is that the jury was influenced by the argument being recorded because the jury could believe, under those circumstances, there was something worth preserving.

In his brief, defendant admits that the court's failure to prohibit the recording of the argument violates no statute. He cites no case law that is violated. He admits the Canons of Judicial Ethics, which have been adopted by this Court, do not specifically deal with this question. He does say that the Code of Judicial Conduct prohibits such recording. However, that Code has not been adopted in Montana. Thus, no law or rule of this Court was violated by the audience's tape recording the argument.

As to defendant's argument that it prejudiced his right to a fair trial, we find no merit in that claim. The rule is that before a judgment in a criminal case will be reversed, prejudice must be shown. *State v. Totterdell*, (1959), 135 Mont. 56, 336 P.2d 696. The defendant must demonstrate prejudice from the record. *State v. Schleining*, (1965), 146 Mont. 1, 403 P.2d 625. Defendant has not demonstrated he was prejudiced by the recording of the closing argument. His right to a fair trial was neither denied nor invaded.

Defendant alleges error because he had to make an out-of-order presentation of his case-in-chief during the State's case-in-chief. The usual order of trial may be departed from in the proper case. Section 95-1911, R.C.M. 1947 states:

"When the state of the pleading requires it, or in any other case, for good reasons, and in discretion of the court, the order prescribed in the last section may be departed from."

We note that the artful phrase "good cause" is not used, rather there must be "good reasons" for the departure of the usual order of the trial.

Defendant's difficulty arose from the fact the FBI agents who were to testify in this case were scheduled to testify in several other cases in other states and the judge would not require them to re-

main for the duration of the trial, nearly three weeks, unless there was good reason to keep them. The court requested defendant make an offer of proof to show why these persons should not be released from their subpoenas after defendant opened his case-in-chief. Defendant argued that no reasonable offer of proof could be made until the completion of the State's case-in-chief. This may well have been true prior to enactment of the liberal discovery procedures in the Code of Criminal Procedure. In the present case, however, defendant had examined the FBI reports; he had examined the physical evidence; and he had a list of the proposed exhibits that were to be put into evidence. If there was some reason to require the FBI agents to remain, defendant would know it at the time of trial. No showing of such need was made and the judge in a proper exercise of his discretion and for good reasons allowed the agents to leave after they had testified as part of the defendant's case-in-chief, in the middle of the State's case-in-chief.

▮ Defendant further alleges error because his expert on mental defect and disease was not allowed to be present during the State's presentation of its rebuttal experts on this matter. Earlier in the trial, defendant sought a ruling from the court that all witnesses be excluded from the courtroom when other witnesses were testifying. The court granted this motion except the court said that the exclusionary rule did not extent to rebuttal witnesses. Defendant's expert was a witness in his case-in-chief. After defendant rested, he sought permission from the court to have this expert present in the courtroom during the testimony of the State's rebuttal experts. The court refused to grant such permission. Defendant alleges this was an abuse of discretion which prejudiced defendant.

We are unconvinced the court abused its discretion. Defendant's expert was a witness in his case to whom the exclusionary rule applied. The fact that defendant wanted to use him as a rebuttal witness did not except him from the exclusionary rule defendant has asked the court to invoke. Nor do we see that defendant was prejudiced by the court's action. The State's rebuttal experts' testimony concerned the report they had made on defendant's men-

tal disease or defect. These were reports that the defense had been supplied with, as required by section 95-505(5), R.C.M.1947. The State's witnesses finished at the end of the day and defendant's rebuttal began the next day. There was time then to inform the defense expert of any additional information not in the report made by these experts, and to prepare rebuttal testimony. Under those circumstances, defendant was not prejudiced.

Defendant argues the evidence is insufficient to justify the verdicts rendered against him He specifically argues that the evidence is insufficient to support the verdicts that defendant committed deliberate homicide by torture and that as a result of her aggravated kidnapping, Lana Harding died.

In *State v. Fitzpatrick*, (1973), 163 Mont. 220, 226, 516 P.2d 605, 609, this Court set forth its position in deteriming questions of sufficiency of the evidence:

"As this Court has held many times over, the jury is the fact finding body in our system of jurisprudence, and its decision is controlling. The jury is free to consider all the evidence presented and to pick and choose which of the witnesses it wishes to believe. If sufficient testimony was introduced, as well as exhibits to justify the jury's findings, then its conclusion will not be disturbed unless it is apparent there was a clear, misunderstanding by the jury or that there was a misrepresentation made to the jury."

In this case, the evidence presented to the jury did not mislead them, nor was any of it ever misrepresented to them. The evidence was sufficient to justify the jury's finding that Lana Harding was killed by means of torture and that she died as a result of her aggravated kidnapping by defendant.

The rule is that if substantial evidence is found to support the verdict, it will stand. *State v. White*, (1965), 146 Mont. 226, 405 P.2d 761; *State v. Stoddard*, (1966), 147 Mont. 402, 412 P.2d 827. Such is the case here.

Defendant alleges error in the trial court's denial of his motion for a new trial. He contends he was entitled to a new trial due to insufficiency of the evidence. He further argues that the cumulation of errors committed in his trial denied him a fair trial.

Since we have held that the evidence was sufficient to sustain defendant's conviction, we further hold the court did not err in denying the motion for new trial.

We find no merit in defendant's argument on cumulative error. Since we have held that no substantial errors were committed, we do not believe the doctrine of cumulative error applies. We are unconvinced that the concepts of "harmless error" and "cumulative error" are interrelated. "Harmless error" refers to technical errors, which do not require reversal. *State v. Gallagher*, (1968), 151 Mont. 501, 445 P.2d 45. "Cumulative error" refers to a number of errors which prejudice defendant's right to a fair trial. *State v. Meidinger*, (1972), 160 Mont. 310, 502 P.2d 58. Having found that no substantial errors were committed by the trial court, we hold that the doctrine of cumulative error does not apply and a new trial will not be ordered.

Defendant asserts that the trial court erred by basing its judgment and sentence upon erroneous findings, conclusions, sentence and order. He further argues the death penalty imposed as a sentence by the trial court is unconstitutional under the United States Constitution and the 1972 Montana Constitution.

As to the errors in the court's findings, conclusion, sentence and order, the errors referred to are essentially clerical errors in the body of that document. A mistaken citation of subsection letter in section 94-5-105, R.C.M.1947, which was caused by the amendment which numbered the section, is an example. This document is not in error with respect to the factual or legal basis of its findings. This Court finds no prejudice in the clerical errors.

Defendant was sentenced to death for his conviction of the offenses of deliberate homicide and aggravated kidnapping. This sentence was imposed by virtue of sections 94-5-105 and 95-5-304, R.C.M.1947. At the time of the crimes, these statutes read:

"94-5-105. Sentence Of Death For Deliberate Homicide.

"(1) When a defendant is convicted of the offense of deliberate homicide the court shall impose a sentence of death in the following circumstances, unless there are mitigating circumstances:

"(a) The deliberate homicide was committed by a person serving a sentence of imprisonment in the state prison; or

"(b) The defendant was previously convicted of another deliberate homicide; or

"(c) The victim of the deliberate homicide was a peace officer killed while performing his duty; or

"(d) The deliberate homicide was committed by means of torture; or

"(e) The deliberate homicide was committed by a person lying in wait or ambush; or

"(f) The deliberate homicide was committed as a part of a scheme or operation which, if completed, would result in the death or more than one person."

"94-5-304. Sentence of Death for Aggravated Kidnapping.

"A Court shall impose the sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as the result of the criminal conduct unless there are mitigating circumstances."

These sections were enacted in 1973, and became effective on January 1, 1974. In 1974, section 94-5-304 was amended by Ch. 126, § 1, Laws of 1974, to read:

"94-5-304. Sentence of death for aggravated kidnapping. A court shall impose the sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as the result of the criminal conduct."

This amendment deleted the phrase: "unless there are mitigating circumstances." The amendment had an effective date of March 11, 1974. At the time of death of Lana Harding, this amendment was not in effect. Therefore, our analysis of the constitutionality of these death penalty statutes will concern them as they existed at the time of the crimes involved in this case.

The death penalty statutes in question here were adopted in response to *Furman v. Georgia*, (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. In *Furman*, the Supreme Court reversed

and vacated death sentences imposed on three defendants. It was a per curiam opinion, with five separate concurrences and four separate dissents. The five concurring opinions each asserted different theories for finding the statutes in question unconstitutional. Essentially, the fatal flaw in the death penalty, under the concurring opinions of *Furman*, was the absence of consistent application of the sanction.

The cumulation of majority opinions in *Furman* led to consideration confusion among the several states' legislatures which desired to retain a constitutionally viable death penalty, i. e., a death penalty that was being imposed consistently and not arbitrarily. In some jurisdictions *Furman* was read as requiring a strictly mandatory death sentence for certain classes of proven crimes. In other jurisdictions, *Furman* was read as attacking unbridled discretion rather than discretion per se. These states passed statutes to control the discretion of the sentencing authority. These statutes allowed the death penalty to be imposed only when unmitigated aggravating circumstances were present.

In 1976, the United States Supreme Court considered the constitutionality of mandatory death penalty statutes. *Woodson v. North Carolina*, (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944. The statute before the Court was North Carolina's death penalty statute. It provided a death sentence for all persons convicted of first degree murder. The Supreme Court held the statute unconstitutional as violative of the Eighth and Fourteenth Amendments. In two later cases, the Supreme Court also held mandatory death penalty statutes unconstitutional. *Coker v. Georgia*, (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982; *Harry Roberts v. Louisiana*, (1977), 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637. The problem with mandatory death penalty statutes, according to the Court, was:

"* * * it is essential that the capital sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or particular offense. * * *" *Harry Roberts*, 431 U.S. 637, 97 S.Ct. 1996.

The death penalty statutes under attack in the instant case, sections 94-5-105 and 94-5-304, as they existed at the time of the crimes, are not mandatory death penalty statutes. Thus, they can withstand scrutiny under the decisions of *Woodson*, *Coker*, and *Harry Roberts* because they allow for consideration of mitigating circumstances.

Also in 1976, the Supreme Court considered the constitutionality of those death penalty statutes that controlled the discretion of the sentencing authority. Unlike their mandatory counterparts, the Court upheld these statutes. *Gregg v. Georgia*, (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida*, (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; and *Jurek v. Texas*, (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. In *Gregg* the Supreme Court stated:

"*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. 189, 96 S.Ct. 2932.

The Montana statutes defendant challenges are designed to control the discretion of the sentencing authority. These statutes are in the constitutionally permissible ground between unbending mandatory death sentences and unbridled discretion in the imposition of the death penalty.

In its discretion of *Gregg*, *Jurek* and *Proffitt*, the United States Supreme Court seems to have established three general criteria which are requisite to a valid death penalty statutory scheme.

First, there must be at least one statutory aggravating circumstance before a death sentence may be considered. Second, the defense must be afforded the opportunity to bring before the sentencing body at a separate sentencing hearing any mitigating circumstances relating to the individual defendant. Third, there must be available prompt judicial review of the sentencing decision by a court of state-wide jurisdiction, providing a means to pro-

mote the evenhanded, rational and consistent imposition of death sentences under the law. Section 94-5-105 and 94-5-304 satisfy the first criterion set forth above. Under section 94-5-105, the death penalty cannot be imposed unless one of six aggravating circumstances is found by the trier of fact to exist. Here, it was found that defendant committed deliberate homicide by means of torture. Section 94-5-105(1)(d), R.C.M.1947. Under 94-5-304, the death sentence cannot be imposed unless it is found the kidnap victim died as a result of the aggravated kidnapping. Such a finding was made in this case by the jury.

The second criterion, that mitigating circumstances be reviewed at a separate sentencing hearing, is satisfied by two separate statutory provisions: First, both death penalty statutes provide that the court "shall" impose a sentence of death "unless there are mitigating circumstances". Defendant urges the "unless" clause may purport to circumscribe the sentencing judge's authority, but there are no guiding standards nor sources of information provided for. This argument ignores the second statutory provision relevant here—that is, the presentence investigation report to be delivered to and considered by the sentencing court in felony cases. Section 95-2204, R.C.M.1947, provides the report shall contain information respecting "the characteristics, circumstances, needs, and potentialities of the defendant; his criminal and social history; the circumstances of the offense; * * * and the harm to the victim, his immediate family, and the community." The report provides the sentencing authority with whatever circumstances may exist in mitigation of the defendant's conduct.

Reading the two provisions together, the sentencing court is required to consider mitigating circumstances and is required to consider the presentence investigation report which must contain any matters relevant to mitigation. In addition, all sentencing courts are directed by section 95-2201, R.C.M.1947, to perform thier sentencing functions "to the end that persons convicted of a crime shall be dealt with in accordance with their individual characteristics, circumstance, needs and potentialities". This man-

dates the imposition of sentences which are not disproportionate to the severity of the crime. Finally, the defendant is authorized to seek a hearing to present to the court his testimony and evidence in mitigation of punishment.

Prompt judicial review of death sentences is provided for by appeal to this Court as well as review to the Sentence Review Division. This Court determines the legality of the sentence imposed, *State v. Simtob*, (1969), 154 Mont. 286, 462 P.2d 873, while the Sentence Review Division is designed to determine the appropriateness of the sentence with respect to the individual offender and particular offense. This satisfies the third criterion.

Although Montana's statutory scheme is unlike those approved by the United States Supreme Court in *Gregg*, *Proffitt*, and *Jurek*, we see no substantive failure of Montana's statutory scheme to comply with constitutional standards. Our system is neither wholly mandatory nor wholly discretionary. There are precise statutory requirements for finding aggravating and mitigating circumstances, and a procedure for flusing out the facts with respect to such circumstances. There is appellate review at two levels, insuring that the sentence is both legal and proportional to the nature and class of crime. In short, we believe that the Montana statutory scheme in existence at the time of the crimes herein, affords defendant the procedural safeguards necessary to protect his substantive rights to be sentenced without arbitrariness or caprice.

Therefore, we hold that the death penalty statutes in question in this case are constitutional under the United States constitutional requirements. They are constitutional on their face and as applied to this defendant.

Defendant next contends that shifting the burden of proving insanity to the defendant offends the due process clause of the Montana Constitution.

Defendant relies on the reasoning of a Colorado case, *State ex rel. Juhan v. District Court*, (1968), 165 Colo. 253, 439 P.2d 741. Prior to *Juhan*, the Colorado Supreme Court had always held the burden was on the state to disprove a properly raised defense of insanity

beyond a reasonable doubt. The legislature subsequently passed a statute purporting to shift the burden to defendant. The Colorado Supreme Court in *Juhan*, in a 3-2 decision, held its previous decisions were interpretations of the due process clause of the Colorado Constitution, and therefore the legislature was powerless to vary the constitutional ruling by legislative enactment.

Defendant's reasoning is similar. In 1895, the United States Supreme Court held that in the federal system, the burden was on the state to disprove insanity beyond a reasonable doubt. *Davis v. United States*, (1895), 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499. Three Montana cases decided shortly thereafter adopted the *Davis* rule for Montana. *State v. Brooks*, (1899), 23 Mont. 146, 57 P. 1038; *State v. Peel;* (1899), 23 Mont. 358, 59 P. 169; *State v. Felker*, (1903), 27 Mont. 451, 71 P. 668. The Montana Legislature in 1925 passed Ch. 87, Laws of 1925, imposing the burden on defendant to prove his insanity by a preponderance of the evidence. This became subsection 2 of former section 94-119, R.C.M.1947. The present statute, passed in 1967, in section 95-503, R.C.M.1947. Thus, the burden has remained on the defendant since 1925. Montana cases since 1925 have relied upon the statute and held the jury should be instructed that defendant must prove insanity by a preponderance of the evidence. *State v. Vettere*, (1926), 76 Mont. 574, 248 P. 179. The main thrust of defendant's argument is that the old Montana cases were of constitutional significance and could not be varied by the legislature; thus Montana's statutes have violated the due process clause of the Montana Constitution since 1925.

The problem with this argument is that it assumes *Brooks, Peel*, and *Felker* were based on the due process clause of the Montana Constitution. There is no mention of the Montana Constitution in any of them. They merely followed the rule announced by the Supreme Court in *Davis*. The Supreme Court in *Leland v. Oregon*, (1952), 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302, noted that *Davis* "obviously establishes no constitutional doctrine, but only the rule to be followed in federal courts." Similarly, it is apparent that *Brooks, Peel* and *Felker* were not establishing a constitutional

doctrine for Montana. Just as Congress could conceivably change the federal rule set forth in *Davis*, the Montana Legislature clearly had the power to change the rule announced in the early Montana cases.

On remand from the United States Supreme Court, the issue before this Court is whether the trial court's instruction on mental disease or defect unconstitutionally shifted the burden of proof of state of mind to defendant. The Supreme Court directed us to reconsider our early decision in this case in light of *Patterson v. New York*, (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281. In doing so, we will examine the defense of mental disease or defect as it exists under Montana law and as applied in this case.

 Evidence of a defendant's mental disease or defect is admissible in Montana criminal trials for two statutory defenses. Section 95-501(a), R.C.M.1947, provides:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he is unable either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

This section defines Montana's "legal insanity" defense. Section 95-503(a), R.C.M.1947, places upon the defendant the burden of establishing his legal insanity by a preponderance of the evidence. Defendant concedes the State may allocate to the defendant the burden of proving his legal insanity without violating the United States Constitution. *Patterson v. New York*, supra; *Rivera v. Delaware*, *(1976)*, *429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160*; *Leland v. Oregon*, supra. Defendant contends, however, that the second criminal defense involving mental disease or defect unconstitutionally shifted the burden to defendant to disprove intent, an essential element of the crime charged.

In addition to the legal insanity defense which, if proven, excludes a defendant's responsibility for an otherwise criminal act, evidence of a defendant's mental disease or defect is also admissible in Montana criminal trials "* * * whenever it is relevant to prove that the defendant did or did not have a state of mind which is an

element of the offense." Section 95-502, R.C.M.1947. This section is a codification of the "diminished capacity" defense, under which a defendant may show that he suffered from a mental disease or defect which, although insufficient to establish legal insanity as a complete defense, made him incapable of forming the criminal intent defined by statute as an element of the crime charged.

In 1967, when section 95-502, R.C.M.1947, was enacted by the Montana legislature, homicide in Montana was divided into four classifications, each requiring a different and specific mental state. The intent element of first degree murder was deliberation, premeditation and malice aforethought, while that of second degree murder was malice aforethought, without deliberation or premeditation. Section 94-2503, R.C.M.1947. *State v. Brooks* (1967), 150 Mont. 399, 436 P.2d 91. Voluntary manslaughter consisted of any unlawful killing, without malice, upon a sudden quarrel or heat of passion. Section 94-2507(1), R.C.M.1947. Involuntary manslaughter, the fourth classification of homicide under Montana criminal law in 1967, did not have criminal intent as a statutory element of the crime; the issue, rather, was one of criminal negligence. Section 94-2507(2), R.C.M.1947. *State v. Souhrada*, (1949), 122 Mont. 377, 204 P.2d 792.

The diminished capacity defense was traditionally used to show that, due to mental disease or defect, the defendant was unable to form the specific intent which was an element of a higher degree of an offense such as homicide, and that a lesser degree of criminal homicide, which lacked that specific intent as an element of the crime, was in fact committed. See, Anno. 22 A.L.R.3d 1228, 1238-43 (1968). Thus, under Montana law in effect when section 95-502, R.C.M.1947, was enacted, evidence of a defendant's mental disease or defect was admissible to prove or disprove, for example, that, although a defendant committed an unlawful killing with malice aforethought, he had not the capacity to form the specific intent—deliberation or premeditation—which was an element of first degree murder.

By January 1974, when Lana Harding was kidnapped and

murdered, Montana had adopted its present criminal code.The new code abolished all distinctions between first and second degree murder. Malice aforethought and premeditation are no longer elements of the criminal homicide offense. The intent element of the crime of homicide under present Montana law is merely "purposely, knowingly, or negligently" causing the death of another human being. Section 94-5-101, R.C.M.1947. There are three types of criminal homicide. Defendant was charged with, and convicted of, deliberate homicide, a criminal homicide committed purposely or knowingly. Section 94-5-102(1)(a), R.C.M.1947. Mitigated deliberate homicide, a lesser offense, also requires that the defendant commit the criminal homicide purposely or knowingly, but that the deliberate homicide be committed under the influence of extreme mental or emotional stress for which there is a reasonable excuse. Section 94-5-103(1), R.C.M.1947. The third type of criminal homicide, negligent homicide, is inapplicable to the facts shown at trial.

Because the statutory definitions of both deliberate homicide and mitigated deliberate homicide require proof by the State of the identical mental element—purposely or knowingly—there was no lesser degree of criminal homicide of which defendant could have been convicted upon proof that he was unable to form the mental state required in deliberate homicide. The State concludes that, because all of the charges required a showing of purposeful or knowing conduct, the section 95-502 defense of mental disease or defect negating the ability to form a purposeful or knowing intent was a complete, rather than a partial, defense and as such merged with the insanity defense of section 95-501.

We do not agree with the State that, in this case, the diminished capacity and insanity defenses were necessarily identical. The prescribed mental state of "purposely or knowingly" applies to each element of the crime of deliberate homicide. Section 94-2-103(1) and (2), R.C.M.1947. To be guilty of deliberate homicide, therefore, one must either have the purpose to kill or know that it was highly probable that his actions would result in

the death of another human being. While legal insanity would have completely exonerated defendant from responsibility for his criminal conduct, the diminished capacity defense could be used in a criminal homicide case to show, for example, "* * * that although defendant knew the nature and quality of the act (the assault * * *) and knew that it was wrong" and so was not irresponsible under the legal insanity test, "he lacked mental capacity to form the intent to kill * * *". Weihofen and Overholser, Mental Disorder Affecting the Degree of a Crime, 56 Yale L.J. 959, 979-80 (1948). A defendant then, due to mental disease or defect precluding him from forming the intent to commit criminal homicide, might be found guilty of the lesser included offense of aggravated assault. See, *State v. Booth*, (1977), 30 Or.App. 351, 567 P.2d 559, 561-62.

Defendant maintains the State was required to prove "* * * that defendant had, and could have had, a particular state of mind which is an element of the offense", and that by making diminished capacity and affirmative defense, the trial judge unconstitutionally shifted to defendant the burden of disproving an essential element of the offenses charged.

"* * * the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed. 2d 368.

We must therefore analyze Montana's deliberate homicide statute to determine if a defendant's lack of mental disease or defect, and his resulting ability to purposely or knowingly cause the death of another person, is a fact necessary to constitute the crime charged. *Patterson v. New York*, supra.

In Montana, a person commits the offense of deliberate homicide if he purposely or knowingly causes the death of another human being. Sections 94-5-102(1)(a), 94-5-101(1), R.C.M.1947. The statutorily defined elements of the offense, each of which the State must prove beyond a reasonable doubt, are therefore causing the

death of another human being with the knowledge that you are causing or with the purpose to cause the death of that human being. A person acts "with knowledge" or "knowingly" "* * * with respect to the result of conduct described by a statute defining an offense when he is aware that it is highly probable that such result will be caused by his conduct. * * *" Section 94-2-101(27), R.C.M.1947. The statute does not require the State to prove the defendant does not suffer from mental disease or defect which would prevent the defendant from doing the act purposely or knowingly.

Because sanity or lack of mental disease or defect is not an element included in the definitions of any of the crimes charged against defendant, the State may rely upon the rebuttable presumption that the defendant was sane when the offense was committed. Cf. *Mullaney v. Wilbur*, (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508; see, *Patterson v. New York*, 432 U.S. 212-216, 97 S.Ct. 2319. The sanity presumption is a presumption which all the states employ in criminal trials. See, H. Weihofen, *Mental Disorder as a Criminal Defense*, (1954), pp. 214-215, and cases collected therein; *Leland v. Oregon*, 343 U.S. at 799, 72 S.Ct. 1002. Without a presumption that everyone is sane and capable of committing crimes, "* * * the government would always be under the necessity of adducing affirmative evidence of the sanity of the accused. But a requirement of that character would seriously delay and embarrass the enforcement of the laws against crime, and in most cases be unnecessary. * * *" *Davis v. United States*, (1895), 160 U.S. 469, 486, 16 S.Ct. 353, 357, 40 L.Ed. 499. The trial court instructed the jury defendant was presumed to have been sane at the time the offenses were committed. Defendant himself in his requested instructions stated that "Every man is presumed to be sane, that is, to be without mental disease or defect * * *." The presumption of sanity did not shift to defendant the burden of disproving a fact necessary to constitute the crime charged.

"* * * To recognize at all a mitigating circumstance does not require the State to prove its nonexistence in each case in which the fact is put in issue * * *.

"* * * Proof of the nonexistence of all affirmative defenses has never been constitutionally required * * *. *Patterson v. New York*, 432 U.S. 209, 210, 97 S.Ct. 2326.

The section 95-502, diminished capacity defense, is an affirmative defense. Section 94-2-103(6), R.C.M.1947. To rebut the presumptions of sanity and capability of forming a purposeful or knowing intent, a defendant may admit evidence relevant to "* * * prove that he did not have a particular state of mind which is an essential element of the offense charged." Section 95-503(b)(2), R.C.M.1947. These sections do not define the standard of proof necessary to establish this affirmative defense, and neither section 95-502 nor section 95-503(b)(2) has been interpreted by this Court. We hold that, to prove a section 95-502 defense, a defendant must prove by a preponderance of the evidence that he lacked the ability, due to mental disease or defect, to form that criminal mental state which is defined by statute as an element of the crime with which he is charged.

Placing on a defendant the burden of proving the diminished capacity defense does not offend "* * * 'some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' * * *" *Speiser v. Randall* (1958), 357 U.S. 513, 523, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460. Several jurisdictions do not even allow diminished capacity as an affirmative defense. See, *State v. Doss*, (1977), 116 Ariz. 156, 568 P.2d 1054; *Bethea v. United States*, (D.C.App.1976), 365 A.2d 64; cases collected in 22 A.L.R.3d 1228, 1235-1238. Indeed, in the sole opinion in which the Supreme Court considered whether a trial court must instruct jurors that they should consider evidence of diminished capacity, the Court held that this was a matter of peculiarly local concern entrusted to the local courts.

"* * * For this Court to force the District of Columbia to adopt such a [diminished capacity] requirement for criminal trials would involve a fundamental change in the common law theory of responsibility." *Fisher v. United States*, (1946), 328 U.S. 463, 476, 66 S.Ct. 1318, 1324, 90 L.Ed. 1382. (Bracketed material added.)

Because psychiatric evaluation as to subtle gradations of mental impairment is highly subjective and not within the common experience of the layman juror, the State may in fairness require a defendant to convince the jury of his diminished capacity by a preponderance of the evidence.

The fact that psychiatry is a developing and, at present, inexact science has long been noted by the courts. See, *Greenwood v. United States*, (1956), 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412; *Warhlich v. Arizona*, (9th Cir. 1973), 479 F.2d 1137; *Bethea v. United States*, supra.

"The science of psychiatry is at most an educated guess as to the certainty of human behavior, which cannot be predicted with any absoluteness. * * *" *People v. Del Guidice*, (1973), 74 Misc.2d 293, 345 N.Y.S.2d 341, 344.

In rejecting the diminished capacity defense, courts have also compared diminished capacity with other defenses and noted:

"* * * unlike the notion of partial or relative insanity, conditions such as intoxication, medication, epilepsy, infancy, or senility are, in varying degrees, susceptible to quantification or objective demonstration, and to lay understanding. * * *" *Bethea v. United States*, 365 A.2d 88.

See, *Wahlrich v. Arizona*, supra; *State v. Doss*, supra.

The myriad problems with allowing the introduction of psychiatric testimony to determine criminal responsibility are discussed in Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom*, 62 Cal.L.Rev. 693, 737 (1974).

Despite the potential problems of proof in allowing the diminished capacity affirmative defense, and despite the fact that a state very likely is not constitutionally required to even allow diminished capacity as an affirmative defense, Montana does allow the defense. While the Montana legislature was willing to recognize diminished capacity:

"* * * as an exculpatory * * * circumstance affecting the degree of culpability * * * it was willing to do so only if the facts making out the defense were established by the defendant with sufficient

certainty. The State was itself unwilling to undertake to establish the absence of those facts beyond reasonable doubt, perhaps fearing that proof would be too difficult and that too many persons deserving treatment as murderers would escape that punishment if the evidence need merely raise a reasonable doubt about the defendant's [diminished capacity]. * * *" *Patterson v. New York*, 432 U.S. 207, 97 S.Ct. 2325.

In this case, the State meticulously proved the facts constituting the deliberate homicide and aggravated kidnapping crimes beyond any reasonable doubt, based on all the evidence including the evidence of defendant's alleged mental disease or defect. The State, consistent with the *Leland* and *Rivera* cases, could then constitutionally refuse to sustain the affirmative defense of diminished capacity unless defendant proved that defense by a preponderance of the evidence.

The instructions given by the court clearly required the State to prove every element of the offenses charged beyond a reasonable doubt and more than gave defendant the benefit of Montana law on the diminished capacity defense burden of proof. In Instruction 53 the jurors were told that, before considering the diminished capacity defense, they were to "* * * first determine from the evidence in the case beyond a reasonable doubt whether the defendant did do the acts charged against him in the Information." The court separately instructed the jury that to find defendant guilty of any of the offenses charged, they must first find that defendant "* * * committed the act or acts charged voluntarily, while having with regard to each element contained in the law defining the offense one of the mental states contained in the said definition". (Instruction 29.) The court instructed the jury that only if it found beyond a reasonable doubt that defendant did any of the acts charged against him in the Information should they then consider "whether or not he could have had the requisite mental state for the act or acts which you have found he committed." (Instruction 53.)

Although the court in Instruction 53 instructed the jury as to defendant's burden of proof for his legal insanity defense, no-

where in the instruction itself did the court specifically instruct the jury as to what burden of proof defendant had to satisfy to establish that he could not form a mental state of "purposely" or "knowingly" due to mental disease or defect (the diminished capacity defense). It is well established, however, that "* * * a single instruction is not viewed in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, (1973), 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368. If all the instructions considered as a whole fairly and accurately present the case to the jury, the fact that one instruction, standing alone, is not as full as it might have been is not reversible error. *State v. Brooks*, (1967), 150 Mont. 399, 436 P.2d 91. Instruction 1 in this case made the jury aware of this rule of law. "* * * you are to consider all of the instructions as a whole, and are to regard each in the light of all the others."

The instructions in this case, when considered as a whole, imposed a more lenient burden of proof on defendant than Montana law provided, because the instructions impressed upon the jury that defendant had successfully established his diminished capacity defense if, after considering all the evidence in the case, the jurors entertained a *reasonable doubt* as to whether defendant suffered from mental disease or defect which prevented him from forming a purposeful or knowing state of mind with respect to the offense charged.

"A person to be guilty of any of the offenses charged in any of the seven counts charged in the Information must have committed the act or acts charged voluntarily, while having with regard to each element contained in the law defining the offense one of the mental states contained in said definition." (Instruction 29)

"* * * In order to convict the defendant of the offense charged in any of said counts all of the material allegations contained in that particular count must be proved beyond a reasonable doubt * * *." (Instruction 6)

"Reasonable doubt is * * * that state of the case which, after the entire comparison and consideration of all the evidence, leaves the

minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge." (Instruction 7)

The instructions which were given to the jury in this case not only protected defendant within the ambit of Montana law, but indeed posited a more liberal burden of proof than that to which defendant was entitled. Not only did the instructions not shift to defendant the burden of disproving any element of the offenses charged, but the instructions, when read together, also required defendant to establish his diminished capacity merely by raising a reasonable doubt, rather than by proof by a preponderance of the evidence.

In summary, we have examined all the specifications of error raised by defendant and find no reversible error. We have further considered this case in light of *Patterson v. New York*, supra, in accordance with the mandate of the United States Supreme Court on remand, and find no error.

The judgment of conviction and the sentence of death are affirmed.

MR. JUSTICE DALY, W. W. LESSLEY, District Judge, sitting for Justice Harrison, and JACK D. SHANSTROM, District Judge, sitting in the vacant seat on the Court, concur.

MR. JUSTICE SHEA dissents.

MR. JUSTICE SHEA dissenting:

I am distressed by the majority opinion, for it confirms my worst fears: The majority has effectively ruled that a brutal, heinous murder justified the State of Montana in suspending the operation and application of the Constitutions of the State of Montana and of the United States of America. It has accomplished this result by ignoring the facts and by an application of the law that is a mockery of the very principles we are sworn to uphold.

At both ends of the procedural spectrum, this Court has denied defendant the constitutional protections to which he is entitled. In the first instance, evidence seized pursuant to a search warrant was

taken in flagrant disregard of defendant's constitutional rights, and accordingly, should have been suppressed. In the second instance, the decision upholding the death penalty under Montana's so-called statutory scheme for imposing the death penalty, is a flagrant misinterpretation of the requirements set forth by the United States Supreme Court. Moreover, it is a flagrant misinterpretation of our own statutes.

The circumstances of this murder whipped the emotions of the citizens of Pondera County to a ferish pitch and caused an outcry throughout this state. It was such that even the trial judge, who did not exactly demonstrate impartiality throughout the trial, moved the trial to Cascade County. I can only conclude that the enormity of the crime has caused this Court as well as the trial court to deny defendant the benefit of the law that supposedly protects all citizens, not solely the "good" citizens. This Court no more granted a fair review to defendant than the citizens of Pondera County could have given him a fair trial. The people of Montana can be well advised there is no law in the State of Montana; that henceforth the Supreme Court shall decide each case on an ad hoc basis.

The majority opinion deceives the reader into thinking the facts set forth in the opinion were substantially the same facts used as a basis to establish probable cause for the initial criminal complaint and arrest warrant and for the issuance of the search warrant. On the issue of probable cause for both the criminal complaint and arrest warrant, and on the general issue of search and seizure, the opinion fails to distinguish between those facts which were developed and used after the issuance of the arrest warrant and search warrant and those which were presented to the magistrate as a basis to establish the probable cause. Obviously, probable cause can be determined only by those facts which are presented to the magistrate.

It is also important to note that defendant has attacked the procedural formalities (having their genesis and foundation in the Montana Constitution and Montana statutes) used for obtaining both the criminal complaint and search warrant. The majority's

response to these issues is almost a stony silence. The issues raised have been sidestepped in a fog of rhetoric.

In fact, the majority sets forth many of the facts in the opinion which were used to obtain a conviction—but *does not distinguish* them from those facts which were used to establish the original probable cause to sign a complaint and to obtain a search warrant. The result is that the reader is led to believe the facts are almost synonymous. For example, at approximately the middle of the court's statement of facts, the following statement infers all the facts developed in the opinion prior to this point were used as a basis to establish probable cause for the original arrest warrant and search warrant:

"As a result of the investigation by the sheriff and his deputies, the county attorney, on Tuesday afternoon, January 22, filed a complaint charging defendant with assault before the justice of the peace. The county attorney also obtained a warrant for the arrest of defendant and a search warrant."

The truth is that only a few of the facts preceding this statement were used as a basis to establish probable cause for the complaint and for the search warrant.

After making this statement the majority continues to foster the wrong impression. The opinion then sets forth facts which came to light *after* the issuance of the arrest and search warrants. But the majority concludes by saying:

"This, in our opinion, is a sufficient showing of probable cause to issue the warrants.

Unfortunately the reader is left in the dark as to what facts or allegations of facts the majority relied on when making this conclusion.

After reading and rereading the majority's statement of facts, I cannot discern those facts upon which the majority relied to conclude there was probable cause to (1) allow the signing of the criminal complaint against defendant for misdemeanor assault and consequent issuance of an arrest warrant, and (2) to allow the issuance of a search warrant authorizing the search of defendant's

home and pickup truck for his clothing allegedly worn on January 21, 1974, and Lana Harding's clothing allegedly worn on January 21, 1974.

Because of this failure to set forth the facts, I am compelled to do so in great detail, because only then can there be a meaningful discussion of the applicable law. A brief analysis of the issues will put the facts in their proper prospective.

The issues raised by the filing of the initial criminal complaint charging defendant with misdemeanor assault and the arrest warrant issued, can be divided into two areas: First, whether under section 95-603, R.C.M.1947, there was probable cause, considering *all* of the evidence presented to the magistrate, to allow the filing of a criminal complaint against defendant. Second, whether the State complied with statutory formalities relating to the signing of the complaint and presenting the evidence on probable cause.

It is also necessary to distinguish between probable cause to sign a criminal complaint and probable cause to obtain a search warrant. To establish probable cause to obtain a criminal complaint there is a two-pronged test: (1) Is it probable that a crime (here, misdemeanor assault) was committed? (2) Is it probable that the defendant committed the crime? Obviously, the State must meet both tests. Probable cause to believe a crime was committed does not ipso facto establish probable cause that a particular defendant committed the crime.

Even assuming the probable cause tests are met for the filing of a criminal complaint, this still does not establish probable cause to obtain a search warrant. Probable cause to obtain a search warrant has a distinct objective—there must be evidence by which a reasonable man would conclude that probably the items sought are at the place sought to be searched. In the context of this case it was required to show facts leading to a reasonable belief that Lana Harding's clothes and defendant's clothes were either in his pickup truck or in his home. Absent evidence to justify such a reasonable belief, the search warrant should not have been issued.

The search and seizure questions can generally be divided into

three areas: First, whether there was probable cause for the issuance of the search warrant, considering all the evidence presented to the magistrate, including that included in the form of a written application and that in the form of unrecorded sworn testimony; second, whether the State complied with the constitutional and statutory formalities relating to the application for a search warrant; and third, whether the search warrant was converted by the sheriff into a general search warrant by the manner in which he executed the search warrant and seized what he considered to be evidence not named in the search warrant.

Concerning the first issue, defendant contends even assuming no procedural irregularities and constitutional and statutory defects in applying for the search warrant, there was no probable cause to issue the search warrant.

Concerning the second issue, defendant contends the manner of applying for the search warrant is constitutionally and statutory defective for two reasons:

(a) That is was unconstitutional to allow a search warrant to be issued based in whole or in part on evidence contained in sworn but unrecorded testimony not reduced to writing;

(b) That the written application for the search warrant cannot be upheld because it is not even an affidavit as required by statute; rather, it is an acknowledgement, signed not before the issuing magistrate, but before the county attorney's secretary.

Concerning the third issue, defendant contends the testimony of the magistrate who issued the search warrant and the testimony of the sheriff who executed the search warrant, together with the sheriff's return of the search warrant, shows conclusively that the search warrant was either on its face invalid because it was a general search warrant, or that the sheriff converted it into a general search warrant and is therefore constitutionally invalid.

While I will develop the facts in detail, they show that the following allegations were used to establish probable cause (the factual statement is indented only for the purpose of emphasis):

At approximately 8 p.m. on January 21, 1974 defendant

knocked on the door of the Pearson residence (approximately one-half mile from the teacherage). He was nervous and excited and appeared out of breath and he told Don Pearson he had been running. He asked Pearson for assistance in starting his truck which was stalled on the road near the teacherage. Defendant also called his wife from the Pearson home and told her he would be home shortly. Pearson left with defendant and got the stalled pickup started by pushing it.

The following morning, January 22, 1974, Lana Harding failed to appear for her teaching duties. Later that morning sheriff's deputies went to the teacherage where she lived (which was just a short distance from the school). During the course of their investigation they found scuff marks on the floor and two throw rugs were disarray. A pair of woman's glasses was on the floor. Outside the teacherage they found a woman's red striped tennis shoe. They also found what appeared to them to be a drag trail from the teacherage to a nearby road. At the end of the drag trail there was a substance on the ground which appeared to be blood. Nearby on the ground was a woman's wristwatch. Pearson apparently told deputy Hoover that defendant's truck was parked in the road close to where the suspected blood and watch were found.

Some of this information was imparted to the magistrate by the unrecorded sworn testimony of deputy Hoover. And some of the information was imparted to the magistrate by the signed, unsworn statement of county attorney Nelson which constituted his application for a search warrant.

All additional facts stated in the majority opinion are those that were sworn either developed after the issuance of the arrest and search warrant, or if any were known before this, they were not given to the magistrate as a basis to establish probable cause. In fact, most of the evidence mentioned in the majority opinion was found either on January 23 (the day Lana Harding's body was found) or on the days following.

It is also significant that the majority failed to distinguish be-

tween those facts presented to the magistrate in the form of the written application for the search warrant, and those facts disclosed to the magistrate by the oral and unrecorded testimony of sheriff's deputy Hoover. All we derive from the majority opinion is their conclusion the *"combination thereof established probable cause."* (Emphasis added.) It is intellectual dishonesty for the majority not to recognize that the *"combination thereof"* is a radical departure from existing interpretations of constitutional law in this state, the only justification of which is to carve out a one time only exception applying to defendant so that his conviction can be upheld.

With these preliminary matters out of the way, I provide a detailed statement of the facts surrounding the issuing of the criminal complaint and arrest and search warrants. It must be remembered that with the exception of the information contained in the application for search warrant, the factual background was developed by defense counsel by taking the depositions of magistrate Wolfe, deputy sheriff Hoover, and county attorney Nelson. These depositions were taken on March 12, 1974, almost three months after defendant was arrested.

Authorities were alerted after Lana Harding failed to show up for teaching duties on the morning of January 22, 1974. The weather was cold, dry and clear. There was no snow on the ground. The sheriff and deputy Hoover drove to the school and teacherage to investigate. Inside the teacherage there were scuff marks on the floor, two small throw rugs were in disarray, and a pair of woman's glasses was on the floor. Outside the teacherage they found a woman's red tennis shoe and there was what appeared to be a drag trail leading ultimately to the road. Near the end of the drag trail, they found a woman's watch and also a substance on the ground that appeared to be blood.

Hoover also talked to Dan Pearson who had helped defendant start his stalled pickup the evening before. Pearson told Hoover that the defendant had come to his home and asked him if he would help him push his stalled truck which **was parked on the road near**

the teacherage. Defendant appeared to be nervous and excited. Defendant told Pearson that he had been running. Defendant called his wife from Pearson's home and told her he would be home after he got his truck started. Late in the afternoon deputy sheriff Hoover went to the county attorney's office to tell him what he had learned.

The county attorney immediately decided to charge defendant with misdemeanor assault. He had his secretary start typing the papers and he called magistrate Wolfe and told him to come down to his office so the county attorney could file a criminal complaint. When the magistrate arrived they talked about things in general. It is not clear but apparently at the same time the county attorney's secretary, Mrs. Malek, was also typing the arrest warrant, the application for search warrant and the search warrant.

After a short while magistrate Wolfe placed deputy Hoover under oath and Hoover testified to what he had learned earlier that day. By this time all the papers were prepared. He testified about Lana Harding not showing up for teaching duties, about the woman's glasses on the floor of the teacherage, and the scuff marks on the floor and rugs in disarray. He also testified as to the woman's watch found in the road not far from the end of the drag trail, and that there also appeared to be blood on the ground, but that they had not determined if it was blood.

He also testified to his conversation with Dan Pearson who told him about his pushing defendant's truck in the vicinity of the teacherage on the night before. Defendant told Pearson he had been running. Pearson told Hoover that defendant was out of breath and appeared nervous and excited. Pearson also told Hoover that defendant called his wife from Pearson's home and told her he would be home soon — when he got his truck started.

The county attorney testified at the deposition that he had no other knowledge of the facts than what had been provided to him by deputy Hoover. Hoover, Wolfe, and Nelson each testified that Nelson never was sworn. Magistrate Wolfe testified that in determining if there was probable cause he relied exclusively on the

testimony of deputy sheriff Hoover and on the written application for search warrant signed by county attorney Nelson. Based on the combination of Hoover's testimony and the written application signed by county attorney Nelson, magistrate Wolfe thought there was probable cause to allow the signing of a criminal complaint of misdemeanor assault and for the issuance of a search warrant.

So that there can be no misinterpretation of the contents of and the form of the written applications for search warrant, it is set forth verbatim:

"STATE OF MONTANA )
 ) ss. AFFIDAVIT
"County of Pondera )

"THE UNDERSIGNED BEING FIRST DULY SWORN DEPOSES AND SAYS:

"That Affiant is the Pondera County Attorney, whose office is in Conrad, Montana;

"That he has reason to believe that one LANA HARDING, a school teacher at Prairie View School, located in Pondera County, Montana, is missing and may have been the victim of foul play;

"That the said LANA HARDING was not present at her school class on the scheduled time on January 22, 1974; that the said LANA HARDING, has a reputation of being a prompt and conscientious teacher, and lived next door to the classroom in the teacherage.

"That investigation by the Pondera County Sheriff's Office has found evidence of scuffling in the teacherage where said LANA HARDING resided. That a red and white striped tennis shoe was found outside the teacherage with bow tied. That there is evidence of an object being dragged from the teacherage. That a woman's watch and blood stains were found in the same areas as the pickup truck driven by DUNCAN McKENZIE, hereinafter referred to as Defendant, was observed on the evening of January 21, 1974, at approximately 8:00 to 8:30 o'clock P.M.

"That the said Defendant appeared highly nervous and excited and out of breath and asked Dan Pearson for assistance to get a

342

1950 black Dodge pickup truck started. That the said defendant resides in the house known as the old Frank Jochem place, located on the Southwest Quarter Northwest Quarter of Section Nine (9), Township Twenty-nine (29) North, Range Two (2) West. That Dan Pearson resides next to the teacherage directly north of the Defendant's residence.

"That the pickup the Defendant was driving was a 1950 black Dodge pickup, and that upon the said Dan Pearson's assisting the said Defendant in starting the pickup he observed the pickup stalled within one hundred (100) feet of the teacherage.

"That upon getting the pickup started the Defendant headed in an easterly direction passing the road south which leads to his house described above as the Frank Jochem place.

"WHEREFORE, the said Affiant, hereby prays for the issuance of a Search Warrant for the search of the said Defendant, DUNCAN McKENZIE, residence located in the Southwest Quarter Northwest Quarter of Section (9), Township Twenty-nine (29) North, Range Two (2) West, and the surrounding building within the curtilage, and for a search of a 1950 black Dodge pickup driven by the Defendant on the night of January 21, 1974. That the object of the search would be to seize the instruments of the assault of the said LANA HARDING, including, but not limited to, the evidence as the whereabouts of the said LANA HARDING, to-wit: a brown long sleeve shirt, jeans and rubber overshoe boots, worn by the Defendant; and black coat, purple sweater, woman's blouse with flower design, woman's pink slacks and woman's red and white striped tennis shoe, and any other contraband articles.

"DATED this 22nd day of January 1974.

"s/David H. Nelson

"David H. Nelson
"Pondera County Attorney

"STATE OF MONTANA )
 ) ss.
"County of Pondera )

"On this 22nd day of January, 1974, before me the undersigned,

a Notary Public for the State of Montana, personally appeared, David H. Nelson, Pondera County Attorney, known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same.

"IN WITNESS WHEREOF, I have hereunto set my hand and affixed by Notarial Seal the day and year first above written.

"s/Elaine M. Malek

(Notarial seal affixed) "Notary Public for the State of Montana Residing at Conrad, Montana. My Commission expires on Nov. 20, 1975."

The above instrument constituted the application for search warrant. At his deposition magistrate Wolfe testified that he relied upon this application plus the oral and unrecorded testimony of deputy Hoover as the sole basis for the issuance of the search warrant. The depositions of deputy Hoover and county attorney Nelson corroborated this testimony.

The magistrate then signed a search warrant which had been prepared by the county attorney's office, and it is also set forth verbatim:

"IN THE JUSTICE COURT OF THE CONRAD TOWNSHIP OF THE STATE OF MONTANA IN AND FOR THE COUNTY OF PONDERA, BEFORE ROBERT O. WOLFE, Justice of the Peace

"THE STATE OF MONTANA,
 Plaintiff,

 --vs-- SEARCH WARRANT
DUNCAN McKENZIE,
 Defendant,

"THE STATE OF MONTANA TO WALTER L. HAMMER-MEISTER, a Peace Officer of this State, or any other Peace Officer:

"A sworn application having been made before me by David H. Nelson, Pondera County Attorney, that he has reason to believe

that on certain premises the County of Pondera, State of Montana, and particularly described as being: The residence of Duncan McKenzie and the surrounding curtilage area known as the old Frank Jochem residence located in the

"Southwest Quarter of Section Nine (9) Township Twenty-nine (29)

North, Range Two (2) West Pondera County, State of Montana

"there are now located certain items of personal property and in a 1950 black Dodge Pickup truck there may be evidence as to the whereabouts of the said LANA HARDING, and other personal property described as, to-wit:

"A brown long sleeve shirt,

"Jeans

"Rubber overshoe boots

"worn by the defendant;

"a black coat

"Purple sweater

"Woman's blouse with flower design

"Woman's pink slacks

"Woman's red and white striped tennis shoe

"and any other contraband articles.

"I am satisfied that there is probable cause to believe that the property described is in or upon the said described real property and 1950 Dodge pickup and further upon the sworn testimony of Deputy Sheriff, Jerry Hoover, taken before this Judge:

"You are hereby commanded to serve this warrant and search the place described above for the property specified, and if the property is found there to seize it, give a receipt for it, prepare a written inventory verified by you of the property seized and bring the property before me, all in the manner required by law.

"DATED this 22nd day of January 1974.

"s/Robert O. Wolfe

"Justice of the Peace (Judge)"

From the depositions of Wolfe, Hoover and Nelson it is not at all clear as to the sequence of signing the search warrant and the criminal complaint and arrest warrant. In any event, the charge of misdemeanor assault read as follows:

"That one Duncan McKenzie on or about the 21st of January, A.D. 1974 in the County of Pondera, State of Montana, committed the crime of ASSAULT, in the (sic) said DUNCAN McKENZIE then and there being, then and there did willfully, wrongfully and unlawfully committed the crime of ASSAULT, in the (sic) said DUNCAN McKENZIE then and there did, willfully, wrongfully, unlawfully and purposefully and knowingly cause bodily injury to LANA HARDING, contrary to the form, force and effect of the statute in such case made and provided, Section 94-5-201, and against the peace and dignity of the State of Montana.

"Such complaint therefore prays that a warrant may issue for the arrest of the said _____ and that he may be dealt with according to law.

"s/David H. Nelson

Subscribed and sworn to before me on this 22nd day of January, A.D. 1947.

"s/Robert O. Wolfe

"Justice of the Peace"

During the taking of depositions magistrate Wolfe, county attorney Nelson and deputy Hoover were asked if magistrate Wolfe had administered an oath to Nelson before Nelson signed the complaint. Each of them testified he had not. However, on a later occasion, some seven months after defendant's arrest, county attorney Nelson testified that he had asked magistrate Wolfe "if he was under oath". There is no indication in the record that a reply was ever made to this question. And also seven months later, magistrate Wolfe testified that he could not remember administering the oath to county attorney Nelson but that it is his custom to do so and that he considered Nelson to be under oath. Magistrate Wolfe testified the probable cause used to allow the signing of the criminal misdemeanor assault complaint was the same as that which was used for

the isuance of the search warrant—namely, the sworn but unrecorded testimony of deputy sheriff Hoover and the written application for the search warrant signed by the county attorney.

Upon receiving the arrest warrant and search warrant, sheriff Hammermeister drove to defendant's home, and soon thereafter commenced a general exploratory search.

The deputy waited in the car and two other deputies waited one hundred yards away as the sheriff went to confront defendant. The sheriff talked with defendant and his wife and then told defendant that he wanted to talk to him alone outside.

Outside he advised defendant of his rights and told him he was under arrest for the assault of Lana Harding and that if they found Lana Harding dead it would be homicide. Hoping that Lana Harding was still alive, sheriff Hammermeister encouraged defendant to tell him where she was and suggested that the prosecutor and judge would be more lenient on him if he told him where she was. They then went back into the house.

When defendant's wife learned of the arrest warrant and search warrant, in the words of sheriff Hammermeister, "she went quite hysterical". Sheriff Hammermeister immediately called his deputies into the house and the search commenced at approximately 7:30 p.m. and lasted until 11:30 p.m. During this time defendant remained handcuffed, first with his hands behind him, but later the handcuffs were taken off and he was cuffed with his hands in front of him. This was apparently in response to a request by defendant that he wanted to hold his children on his lap. The record does not disclose whether the sheriff allowed the defendant to hold his children.

The search that ensued was not confined to that of looking for the items listed on the search warrant; rather, it was a blanket search. The sheriff seized all property he thought might somehow fit into the case. He noticed what he thought to be blood and hair in the bed of the pickup truck and seized the truck and all its contents. He seized many items of men's clothes that were not described in the search warrant. He forced defendant to strip and seize all the

clothes he was wearing. He cut off a piece of hair from defendant's head and seized it as evidence. While defendant was stripped naked, the sheriff also "plucked" some pubic hair from defendant's body. Finally, the sheriff and his deputies headed to town with defendant in custody and the bounty of their search in their possession.

On the following day, January 23, 1974, the sheriff filed with the magistrate a sworn statement listing the items he seized pursuant to the search warrant:

"RETURN AND RECEIPT OF SEARCH WARRANT

"JUSTICE COURT OF ROBERT O. WOLFE

"STATE OF MONTANA
 VS. County of Pondera
"DUNCAN McKENZIE
 "Defendant "Robert O. Wolfe

_____

 "Judge Issuing

"I, W. L. Hammermeister, Sheriff, by authority of a search warrant directed to W. L. Hammermeister by this court on 22nd day of January 1974, have searched the premises described in the warrant and have seized the following items of personal property as directed by the warrant:

1 pair of red wing boots:
1 pair blue jean type pants taken off person:
1 pair of overshoes:
1 pair of cowboy boots taken off his person:
1 pair white shorts taken off person:
1 pickup and complete contents:
1 pair gloves black and white taken off person:
1 plaid jacket brown and white:
1 white T-shirt taken off person:
1 Air force type jacket taken off person:
1 pair white socks taken off person:
1 pen and jank knife taken off person:
Pubic hairs of suspect: head hairs of suspect.

"This list is full and complete and contains every item siezed by me.

"W. L. Hammermeister, being first duly sworn, deposes and says that he is the person named in the above return and that he has prepared it; that all of the matters stated therein are true; that the list of personal property is true and complete; and that the property has been delivered to the proper judge.

"s/ W. L. Hammermeister

"Sworn to and subscribed before me on 1-23-74.

"s/ Robert O. Wolfe

"Judge"

The only items on the return which can at least arguably be considered as being seized pursuant to the search warrant are a pair of blue jeans (taken from defendant's person) and a pair of boots. All other items seized were not on the search warrant.

After defense counsel was appointed for defendant, they filed extensive supporting briefs in support of their arguments that the evidence should be suppressed because it was illegally seized. They also made a reasonable request of the district judge that as to each of the contentions he make findings of in his order. Shortly after the hearing on the motion to suppress the following exchange took place:

"THE COURT: You want me to do what?

"DEFENSE COUNSEL: Include in your order a finding upon which you base your order.

"THE COURT: Certainly I will make a finding upon it. Your motion to suppress, I do not believe, was well taken. The evidence seized under an order—the term escapes me for a moment, but they obtained a search warrant. I found that it was validly issued on probable cause.

"DEFENSE COUNSEL: That is what I wanted the Court to make out.

"THE COURT: It is of record, the moment I state it is done but I will make it perfectly clear."

A short time later the court issued an order covering several defense motions. The entirety of the order based on the motion to suppress is:

"The defendant's Motion to Suppress Evidence heretofore argued and briefed is hereby DENIED."

Obviously, defense counsel had no way of determining why the court ruled the way it did, or even if the trial court seriously considered the motion to suppress. I can only conclude that it was not seriously considered.

After the jury returned with its guilty verdict and motions for a new trial had been made and argued, the court again ruled in a summary fashion as to all the grounds raised for a new trial, merely concluding the motion for new trial was denied. Again, defense counsel has no way of understanding the reasoning process of the trial court because of the order entered. The importance of setting out the reasoning processes of the trial court has been thoroughly set forth in *Ballantyne v. Anaconda Co.*, (1978), 175 Mont. 406, 574 P.2d 582. I must confess however that this Court did not do appreciably better in discussing the issues raised by defendant.

Based on what was contained in the application for search warrant and the testimony apparently given by deputy Hoover, was there probable cause to arrest the defendant? The majority's legal analysis of the issue is faulty. In fact the opinion makes the unsupportable assumption that if there is probable cause to obtain a warrant of arrest the same set of facts also supports probable cause to obtain a search warrant. A first year law student would know that these issues are separate. But the majority wraps them together as one package:

"We disagree with defendant's contention there was no *probable cause for the arrest or search warrant.* This Court in *State ex rel. Garris v. Wilson,* (1973), 162 Mont. 256, 511 P.2d 15, considered federal case law and the long standing rule in this jurisdiction on *probable cause for arrest and search warrants noting:* [My emphasis.]

" 'We reach this decision by application of the following standards: *Only a probability of criminal conduct need be shown.*'

"Far more was shown here. See: *State v. Troglia*, (1971), 157 Mont. 22, 482 P.2d 143; *Spinelli v. United States*, (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637."

While concluding that far more than a probability of criminal conduct was shown here, the opinion does not say what it was. On this bald statement how can anyone conclude there was probable cause? Where the facts are not set forth no one would accept these conclusions. A probability of criminal conduct is not sufficient. There must also be a probability of defendant's criminal conduct.

I fail to see any purpose for the Court to cite the *Spinelli* case by the United States Supreme Court, or the *Troglia* case, decided by this Court. They have absolutely no application to the facts of this case, although there was a discussion of probable cause to obtain a search warrant, as there almost invariably is in a search and seizure case arising out of the issuance of a search warrant.

Nor does *State ex rel. Garris*, supra, cited and quoted with approval by the majority, bear on the issues of this case. Indeed, the case supports defendant's position. In *Garris* the police obtained a search warrant for a home in which Garris lived. The home was actually rented to someone else and Garris only rented a room. A detailed probable cause affidavit was provided the magistrate showing drug activity going on inside the house but not showing that Garris had anything to do with the activity. The police then searched his room and found drugs. This Court ordered the evidence suppressed, the underlying reason being that Garris was not tied in by the affidavit to any of the criminal activity and therefore the police were not at liberty to search his room pursuant to the search warrant obtained to search the entire house. Moreover, the language quoted by the majority as coming from *Garris* actually came from a federal case, *Coury v. United States*, (6th Cir. 19709), 426 F.2d 1354. The implication is that this Court first used this language rather than adopting it from *Coury*. In any event, the issue was entirely different in *Coury*. There, the question

was not whether defendant was identified with any criminal activity—there was no question that defendant was involved in the activities. Rather, the issue was whether the activities in the affidavits of the FBI agents to obtain a search warrant constituted probable cause to conclude that the activities were criminal in nature. The FBI agents were investigating bookmaking activities. In concluding that there was "a probability of criminal conduct" the court summarized:

"The commissioner's finding of probable cause was based on the three affidavits and the statement of Special Agent Thomas. The Thomas statement specifically set forth the underlying circumstances supporting his affidavit. Amont other things, it described his background as investigator of interstate gambling activities and stated that he had personally conducted an investigation of appellant, including surveillance of his home; that he knew appellant to be a bookmaker and a gambler, and knew of his prior conviction for bookmaking activities; also that telephone company records listed calls between appellant and known gamblers in other states. In addition, the Bishop affidavit cited telephone company records showing calls from another well-known gambler to appellant's home. We agree with the district judge that the constitutional requirements for issuance of the warrants were satisfied.

"We reach this decision by application of the following standards: only a probability of criminal conduct need be shown * * *." 426 F.2d at 1356.

It should also be noted that the Thomas affidavit incorporated by reference an attached statement which he had previously written thereby also causing it to become part of a sworn, written statement.

The foregoing is the genesis of the quotation of law misapplied in this case. In the context of this case the majority would have been accurate if they had stated that "only a probability of [the defendant McKenzie's] criminal conduct need be shown." But the majority never came to grips with this crucial issue. Common sense would dictate that this would have to be the law. Otherwise, the law of probable cause is meaningless.

Indeed, the requirement of probable cause for an arrest warrant is covered by statute in this state. Section 95-603, R.C.M.1947, provides in relevant part:

"(a) A complaint, as the basis of an arrest warrant, shall be in writing.

"(c) If it appears from the contents of the complaint and the examination of the complainant and other witnesses, if any, that there is *probable cause to believe that the person against whom the complaint was made has committed an offense* a warrant shall be issued by the court for the arrest of the person complained against. * * *" (Emphasis added.)

The purpose of requiring probable cause either an arrest warrant or search warrant would issue has been declared in *Wong Sun v. United States*, (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441:

"* * * [It] serves to insure that the deliberate, impartial judgment of a judicial officer will be interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause. * * *" 371 U.S. at 481, 482, 83 S.Ct. at 414.

Nor should the fundamental requirements of probable cause ever be relaxed, for as stated in *Wong Sun:*

"* * * The history of the use, and not the infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers' whim or caprice.' *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879." 371 U.S. at 479, 83 S.Ct. at 413.

Several probable cause definitions have been adopted, but most of them essentially require that a reasonable man (a man of ordinary prudence and caution) have evidence before him that a crime has probably been committed and that the defendant probably committed the crime. In *Stacey v. Emery*, (1878), 97 U.S. 642, 7 Otto 642, 24 L.Ed. 1035, the United States Supreme Court cited with approval several definitions adopted by the various states:

"* * * 'A reasonable ground of suspicion supported by circum-

stances sufficiently strong in themselves to warrant a cautious man in the belief that the party is guilty of the offense with which he is charged. * * *'

"* * * 'Such a state of facts would lead a man of ordinary caution to believe, or to entertain an honest and strong suspicion, that the person is guilty.' * * *'" 97 U.S. at 645.

And this Court has quoted with approval several definitions of probable cause defined by other states. In *State ex rel. Wong You v. District Court*, (1938), 106 Mont. 347, 352-53, 78 P.2d 353, this Court quoted the following language with approval from *State ex rel. Neville v. Mullen*, (1922), 63 Mont. 50, 207 P. 634, stating:

"* * * 'The terms "probable cause" are variously defined, but an analysis of the definitions will disclose that the difference, if any, is in the mode of expression, rather than in the substance. "Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." * * * "Probable cause [for a criminal prosecution] is, in effect, the concurrence of the belief of guilt with the existence of facts and circumstances reasonably warranting the belief." * * * "The expression *'probable cause,' as used in the federal Constitution*, referring to the issuance of warrants, *means that there is a probability that a crime has been committed by the person named in the warrant.*" * * *'" (Emphasis added.)

In making a statement of probable cause (whether it be for a criminal complaint and warrant of arrest or for the issuance of a search warrant) it is required that the application provide the underlying evidentiary basis for the issuance of the complaint (and arrest warrant) or search warrant. In *State ex rel. Samlin v. District Court*, (1921), 59 Mont. 600, 198 P. 362, a case involving an application for a search warrant, this Court stated:

"* * * A *warrant issued upon a conclusion of the applicant, without any facts stated in the application* upon which the judicial officer to whom it is addressed may form his own conclusion, *is not a showing of 'probable cause* supported by oath or affirmation'

within the meaning of the guaranty. * * *" (Emphasis added.) 59 Mont. at 611, 198 P. at 365.

With the exception of the present case this Court has never abandoned this requirement in favor of a looser standard.

The United States Constitution makes no distinction between search warrants and arrest warrants in terms of establishing probable cause. In *Ker v. California*, (1963), 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, the United States Supreme Court held that under the Fourth Amendment an arrest is a seizure and therefore must comply with the requirement of probable cause. If we did not require evidentiary facts to be contained in the application for criminal complaints or search warrants, the magistrate would be in no position to make an independent determination of probable cause. It is clear that under the United States Constitution the facts must be stated in detail and with specificity rather than by conclusionary statements. In the present case the testimony of the magistrate at his deposition shows that he did not have the slightest idea of what probable cause is, and in fact, applied the wrong standards:

"Q. Did Mr. Hoover tell you anything or give you any information that led you to believe—other than what you already told us here—that Duncan McKenzie committed the crime of assault upon one Lana Harding. A. No. The testimony that he gave and the facts that he told me about led me to believe that there was—

"Q. A *possibility* that a *crime* had been committed? A. A *possibility* that an *assault* had been *committed.*" (Emphasis added.)

It is true that if the probable cause actually exists, the fact that the judge determines probable cause by using an erroneous standard, will not invalidate the issuance of either a criminal complaint and arrest warrant or search warrant. But here there is clear evidence that the magistrate himself thought that there was only the possibility that an assault had been committed. His discretion was moved by applying the wrong standard. An analysis of the facts presented to him shows no more than the possibility that an assault was committed and no more than the possibility that defendant committed the possible assault.

The constitution of this state contains a specific provision in relation to search and seizure of persons or things. Article II, Section 11, 1972 Montana Constitution provides:

"The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing."

This provision was adopted word for word from the former 1889 constitution. The only difference is that a period was placed after the word "seizures", and then started again with a new sentence. In *Nolan v. Brantly*, (1897), 20 Mont. 173, 178, 50 P. 410, this Court held this provision to apply to probable cause to obtain a warrant of arrest for a person. Since there is no change in the provisions of the old and new constitutions, I am convinced that in order to obtain a warrant of arrest for a person, there must be "probable cause, supported by oath or affirmation, reduced to writing." In this case neither requirement was satisfied.

The complaint filed in this case (ostensibly in affidavit form), contains no evidentiary foundation for the charge—only a bald conclusion that defendant committed an assault on Lana Harding on January 21, 1974. The only other written document is the application for search warrant, signed by county attorney Nelson. However, this is not in the form of testimony or sworn statement because it is not in affidavit form. It is merely a statement signed by the county attorney before his own secretary whereby she acknowledged the genuineness of his signature. For this reason this document should not and cannot be considered as a testimonial support for the charges. Nonetheless, even assuming that it could properly be considered as testimony, it did not establish probable cause, either alone or in conjunction with the testimony of deputy Hoover.

The only testimony of the complaint and arrest warrant (also used as support for the search warrant) is the oral unrecorded

testimony of deputy Hoover. At his deposition he tried to recall testimony he gave to magistrate Wolfe on January 22, 1974. There is also the deposition testimony of magistrate Wolfe who tried to recall the testimony that deputy Hoover had given three months earlier. The problems of trying to reconstruct testimony on such matters were pointed out by defense counsel where he states: "Unless the facts upon which their [the magistrate's] discretion is exercised is reduced to writing a reviewing authority would ever be at a loss to determine whether probable cause did in fact exist at the time the warrant was issued. This could destroy the use of the exclusionary rule as directed by the United States Supreme Court in *Mapp v. Ohio*, (1961), 367 U.S. 643, 81 S.Ct. 1584, [1684] 6 L.Ed.2d 1081; and *Ker v. California*, (1963), 37 [374] U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726." That is precisely the problem this Court was faced with, but it chose to bury the problem by an incomprehensible recitation of the facts in relation to the issue of probable cause.

There are other dangers of not reducing the testimony to writing or otherwise recording it (and the dangers apply equally if not more so to the issue of probable cause for a search warrant). Over a period of time, memories get faulty and at best one can reconstruct only a piecemeal version of what testimony was actually given before the magistrate in support of probable cause. Moreover, as the issues became more sharpened and defined, those who gave testimony and heard testimony, in an effort not to free a defendant because the "constable blundered" will seek to dovetail and synchronize their testimony, in the interest of justice of course. There is no way a defendant can fight this kind of institutional conspiracy.

Because of the so-called presumptions of regularity that abound as to official acts, the defendant, if he is to contest the actions of the government, has the unenviable task of deposing those who participated in giving and hearing the testimony in support of probable cause. But suppose the person who gave the testimony swears to one version of what he testified to and the magistrate who heard

the testimony swears to another version of the witness' testimony. Assume that it is a crucial, pivotal issue. Whose word does the reviewing court believe—the person who gave the testimony or the magistrate who heard the testimony? In either event, is it fair to the defendant? The testimony reduced to writing in affidavit form or the testimony recorded on a tape recorder would have eliminated this problem. It is the only proper way to proceed.

While this has always been a problem in this state with regard to probable cause to file a criminal complaint, it was not a problem with regard to an application for a search warrant until the Court's decision in this case. The law formerly was, and probable will still be (except for its application to the defendant in this case) that the facts constituting probable cause for a search warrant must be contained within the four corners of the affidavit in support of the application for the search warrant. If not, they will not and cannot be considered.

We must look first to who testified before the magistrate in support of the probable cause for the criminal charge and the search warrant. The majority opinion deceptively leaves the impression that the county attorney was sworn and gave testimony (although unrecorded) in support of the probable cause:

"* * * Here, unlike *Gray, there was*, in effect, *sworn testimony by the county attorney* and deputy sheriff in *addition to the affidavit*, and the combination thereof established probable cause. * * *" (Emphasis added.)

But such is not the case at all. At his deposition taken three months after defendant was arrested, the county attorney testified:

"Q. Do you know of any other evidence or information that could have been given or was given of your own knowledge, to the Justice of the Peace other than what is contained in your Affidavit or the testimony of Jerry Hoover? A. I know of none, no. At that time I didn't know at the—

"Q. You didn't know what? A. I didn't know of any other information at the time of the Search Warrant and application for it.

"Q. That isn't what I asked. I asked do you know whether or not

any other evidence was presented to the Justice of the Peace. A. No. None.

"Q. Nothing other than what is contained in your Affidavit and the testimony given by Jerry Hoover. A. Right."

The "Affidavit" referred to here, and also referred to by the majority as an "affidavit" (but never discussed or analyzed, even though defendant raised this as an issue) was nothing more than a signature acknoledgement witnessed by the county attorney's secretary. It was not a sworn document in the form of an affidavit.

The deposition testimony of deputy Hoover and magistrate Wolfe, also confirms the testimony of the county attorney. (It should be noted here also that the references in their testimony to an "Affidavit" is in fact the signature acknowledgement witnessed by the county attorney's secretary). Deputy Hoover testified as follows:

"Q. But my question initially was whether or not you know of any other information, other than what you told the Justice of the Peace and what was contained in the Affidavit of the County Attorney, that was presented to him? A. No, not that I know of."

The deposition of magistrate Wolfe confirmed this testimony:

"Q. Based upon the testimony of Mr. Hoover and this Affidavit, you issued a Warrant of Arrest? A. That is correct.

"Q. And you issued a search warrant.? A. That is correct.

"Q. Was there any other testimony or information brought to your attention that was not included in the sworn statement of Mr. Jerry Hoover, the Deputy Sheriff, or in this Affidavit? Was there any other evidence brought to your attention at that time? A. Not as far as I can remember.

Accordingly, the majority opinions is totally in error in concluding that county attorney Nelson gave testimony in addition to what was contained in the "affidavit". And this is not the only manner in which the opinion is rather slippery with the facts.

We know by the deposition testimony of county attorney Nelson, magistrate Wolfe, and deputy sheriff Hoover, that only Hoover's

testimony and the written application signed by the county attorney was used as a basis for the probable cause statement. However, the majority opinion states:

"* * * County Attorney Nelson testified he had been at the scene with the sheriff and his deputies during the afternoon and just prior to his coming to town to get the warrants issued. At the hearing [it appears the majority is talking about the original so-called hearing where the probable cause statements were given to magistrate Wolfe] he said in response to a question [a question from the magistrate, or a question from the lawyer who was taking his deposition] of what knowledge he had of the facts:

"'A. Well, without looking at the affidavit now—I think the first paragraph or two is my statement as to what I determined, that she was missing and may have been the victim of foul play but of what nature we didn't know at the particular time, and that she resided at the teacherage.'"

The fact is that the answer was given to a question asked of the county attorney by defense counsel when he was being deposed three months after issuance of the arrest warrant and search warrant. How this can add anything at all to a statement of probable cause for arrest warrants and search warrants is incomprehensible. In fact, the statement itself indicates that all concerned had only determined that Lana Harding was missing (which was not too difficult to determine) and that she "may" have been the victim of "foul play". That one may have been the victim of foul play does not establish probable cause to arrest a person for misdemeanor assault and to obtain search warrants to search his house and his truck.

And again the majority appears to leave the impression that the Pearsons testified before the magistrate as to defendant having been parked in the road near the teacherage on the evening of January 21, 1974. Mrs. Pearson was not even involved in going with defendant to help get his truck started. Moreover, what Dan Pearson knew of the facts was only repeated to the magistrate through the lips of deputy Hoover.

The majority also states that "it was there that the victim's watch was found in a pool of blood by the investigating officers before going to town to get the warrants." Again, the opinion is misleading. At the time the warrants were obtained the watch had not been identified as belonging to anyone. And neither was the watch found in a pool of blood. At his deposition concerning his previous testimony given to the magistrate, deputy Hoover only testified that a woman's watch was found on the road and nearby was what appeared to be blood. Magistrate Wolfe testified as to the watch and the blood as follows:

"* * * Hoover then went on to relate that in the roadway there was a ladies watch that was found and it was broken—I'm not sure now whether it was broken or not—but they found a ladies wristwatch there. They also found a pool of liquid substance that looked like it was blood, and at that time they could not verify whether it was blood or if it was human blood or what it was. They had taken samples of this sent it into the office of a pathologist to have examinations run on it."

I first discuss the written application for search warrant. While the majority did not discuss the factual basis for its conclusion, it is fair to say that they believed the application for search warrant was insufficient in and of itself for either an arrest warrant or search warrant. Otherwise, I presume they would not have made the following statement:

"* * * In addition, the county attorney examined Deputy Hoover before the justice of the peace as to facts he learned during the investigation. Here, unlike *Gray*, three. was, in effect, *sworn testimony* by the county attorney and deputy sheriff *in addition to the affidavit, and the combination thereof established probable cause.* * * *" (Emphasis added.)

An examination of the application certainly supports the conclusion that the application was not sufficient by itself.

The application violates one of the fundamental requirements that conclusions are not sufficient. There must be an evidentiary basis for the conclusion. Here, several conclusions were made with no evidentiary foundation:

"* * * sheriff's office has found evidence of scuffling in the teacherage;"

"* * * there is evidence of an object being dragged from the teacherage;"

"* * * that * * * blood stains were found;"

"* * * said defendant appeared highly nervous and out of breath * * *."

There is no way that an impartial magistrate could make an independent conclusion as to the sufficiency of these statements.

In *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, the United States Supreme Court quoted *Giordenello v. United States*, (1958), 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 as setting forth the "guiding principles upon which probable cause is based:

"* * * the inferences from the facts which lead to the complaint '[must] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' * * * The purpose of the complaint, then, is to enable the appropriate magistrate * * * to determine whether the 'probable cause' required to support a warrant exists. The Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. *He should not accept without question the complaint's mere conclusion* * * *." (Emphasis added.)

In the present case the entire application for search warrant contained only "mere conclusions" with no underlying factual basis. And there is yet another glaring defect in the application. That portions of the application placing defendant near the teacherage in his stalled pickup on January 21 is not only based on hearsay, but we cannot conclude Dan Pearson (the informant, so to speak) was personally interviewed by any member of the sheriff's office. While it is true that hearsay can be relied on to help establish probable cause, there must be a basis in the application itself whereby the magistrate can conclude that the hearsay informant is trustworthy

and reliable. If this is not done, then the hearsay evidence cannot be used to establish probable cause. *Aguilar v. Texas*, supra.

The hearsay problems in this case are much worse than those which existed in *Aguilar*. There, the applying officer talked directly to the informant, but in his application set forth no basis from which the magistrate could conclude that the informant was trustworthy and reliable. In the present situation there is no basis to conclude who it was that Dan Pearson talked to:

"* * * that a woman's watch and blood stains were found in the same area as the pickup truck driven by Duncan McKenzie, hereinafter referred to as defendant, was observed on the evening of January 21, 1974, at approximately 8:00 to 8:30 o'clock P.M.

"That the said Defendant appeared highly nervous and out of breath and asked Dan Pearson for assistance to get a 1950 black Dodge pickup truck started. That the said defendant called his wife from Dan Pearson's home.

"That the pickup the Defendant was driving was a 1950 black Dodge pickup, and that upon said Dan Pearson's assisting the said Defendant in starting the pickup stalled within one hundred (100) feet of the teacherage.

"That in getting the pickup started the Defendant headed in an easterly direction passing the road south which leads to his house described above as the Frank Jochem place."

From the above we cannot conclude that Dan Pearson told this to deputy Jerry Hoover or any other member of the sheriff's office. In fact, it cannot be determined how this information was acquired. The county attorney, who signed the application for search warrant certainly did not talk to Dan Pearson. This, combined with a failure in any way to attribute reliability or trustworthiness to Dan Pearson's statement (to someone), leaves no doubt that the written application is fatally defective.

Assuming moreover, that the application properly presented evidence of defendant's presence near the teacherage on January 21, it does not reasonably allow a conclusion that he assaulted Lana Harding or committed any other crime. Obviously, law en-

forcement officers would have wanted to talk to him to determine if he had any knowledge of her whereabouts. Assuming the inferences in the application that Lana Harding was forcefully abducted from the teacherage, there is no *time* stated when this was done. Was it before 8:00 or 8:30 p.m. on January 21, or was it after 8:00 or 8:30 p.m. on January 21, but before sunrise the following morning. This we cannot tell from the application. Needless to say, there was no basis to conclude that defendant had caused her disappearance. There was a possibility that he may have had something to do with her disappearance. Therefore, the defendant should have been under suspicion. That he should have been arrested—absolutely not.

There is yet another reason why the application for search warrant should not be considered, either alone, or in conjunction with the oral, unrecorded testimony of deputy Sheriff Hoover, as probable cause for an arrest warrant (or search warrant)—the application is not a sworn document. The jurant to the application reads:

> "s/David H. Nelson
>
> "David H. Nelson
> "Pondera County Attorney

"STATE OF MONTANA )
) ss.
"County of Pondera )

"On this 22nd day of January 1974, before me the undersigned, a Notary Public for the State of Montana, personally appeared, David H. Nelson, Pondera County Attorney known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that executed the same.

"IN WITNESS WHEREOF, I have hereunto set my hand and affixed by Notarial Seal the day and year first above written.

> "s/Elaine M. Malek

(Notarail seal "Notary Public for the State of
 affixed) Montana residing at Conrad, Montana. My Commission expires on November 20, 1975."

364

It takes no legal giant to conclude that the county attorney did not sign a sworn statement. He merely signed an unsworn statement and his secretary acknowledged that he did sign the statement. An acknowledgement is defined as follows:

"Formal declaration before authorized official, by person who executed instrument, that is is his free act and deed. (Citing authority.) The certificate of the officer on such instrument that it has been so acknowledged. (Citing authority.)" Black's Law Dictionary, 4th Edition, p. 39.

On the other hand, an affidavit is defined as:

"As written or printed declaration or statement of facts, made voluntarily, and confirmed by the oath or affirmation of the party making it, taken before an officer having the authority to administer such oath. (Citing authority.) A statement or declaration reduced to writing, and sworn to or affirmed before some officer who has authority to administer an oath or affirmation. (Citing authority)." Black's Law Dictionary, 4th Edition, p. 39.

The form normally used in this state at the bottom of the document, to constitute an affidavit, is as follows:

s/ _____
(Signature of applicant)

STATE OF MONTANA )
 ) ss.
County of _____ )

Subscribed and sworn to before me this _____ day of _____, 19___.

s/ (signature of notary)
(notarial seal) Notary public for the State of Montana, residing at _____.
My Commission expires _____
_____.

It must be remembered that defendant contended that even the complaint was deficient because although in affidavit form, the magistrate never did officially swear county attorney Nelson to

swear to the truth before he signed the complaint. Accordingly, the majority opinion leaves the false impression where it stated:

"A summary of the testimony shows Justice of the Peace Wolfe testified [at the hearing on the motion to suppress] he customarily swears all witnesses though he did not recall swearing in the county attorney, he considered him sworn."

The impression left by the statement is that the county attorney was sworn with relation to three matters: (1) The oral testimony he gave in support of the arrest warrant and search warrant. (We have already seen where deputy Hoover, magistrate Wolfe, and county attorney Nelson himself testified he offered nothing in support of the probable cause statements.) (2) The criminal complaint signed by the county attorney charging defendant with misdemeanor assault. And, (3) the application for search warrant signed by the county attorney, but which was not in affidavit form.

The unequivocal testimony of magistrate Wolfe when he testified he customarily swears in witnesses, was in relation to swearing in witnesses before they would be allowed to sign a criminal complaint. His testimony was:

"When he puts his signature on that I take that he swore to his *complaint* as being true and correct. The only individual to my recollection that was sworn in orally was Mr. Hoover." (Emphasis added.)

It is clear therefore, that magistrate Wolfe did not testify that county attorney Nelson swore to the contents of the application for search warrant. Indeed, the county attorney had already signed this document in front of his secretary.

Section 95-603 does not explicitly require the testimony to be taken by the magistrate, and by implication the testimony could be given in the form of an affidavit before any notary, and then filed with the magistrate as part of or as probable cause to file a criminal complaint. Obviously, it would be preferable to have all sworn statements taken under oath before the magistrate. Nonetheless, there is one rock bottom requirement, and that is that the statement, whereever taken, be in fact a sworn statement. And

that is precisely the problem here. While conceivably the county attorney could sign a sworn statement before his secretary (who was a notary), here there was no sworn statement at all. Accordingly, the application for search warrant could not be considered as fulfilling in whole or in part the requirements of probable cause. Its form prevented it from being considered as such.

I next discuss the oral testimony allegedly given by deputy sheriff Hoover to magistrate Wolfe before the issuance of the arrest warrant and search warrant. In doing so I assume for argument purposes, that the application for search warrant signed by county attorney Nelson, was in proper form and therefore could be considered as part of the probable cause application. In this context the question becomes whether the document signed by the county attorney, when considered in conjunction with the unrecorded testimony of deputy sheriff Hoover, constitutes probable cause to obtain an arrest warrant and search warrant.

The oral testimony allegedly given by deputy Hoover to magistrate Wolfe did help to fill in some holes in the signed application for search warrant, but they were inconsequential holes, and under no circumstances was there probable cause to conclude that defendant had assaulted Lana Harding or had committed any other crime upon her. Again, we must start with a reconstruction of this testimony through the depositions of deputy Hoover, magistrate Wolfe and county attorney Nelson, some three months after the arrest.

Essentially, the testimony revolved around those statements that were "mere conclusions" in the county attorney's application: evidence of scuffling in the teacherage; a woman's red shoe outside the teacherage; a drag trail outside the teacherage; blood stains and a woman's watch on the road; defendant going to Dan Pearson's home out of breath and asking him to push his truck (and calling his wife); defendant's pickup truck being parked on the road near the teacherage. There was no testimony as to why the objects sought to be seized (Lana Harding's clothes, and defendant's clothes) were probably either in his house or in his pickup truck. (I

will discuss this topic later, as it directly bears on probable cause to obtain a search warrant.)

The crucial testimony of Hoover as to what he told magistrate. Wolfe is as follows:

"Q. Give us, as best you can, the substance of your testimony to the Justice of the Peace—your sworn testimony to the Justice of the Peace. A. I explained to him about the sheriff receiving a phone call and about the Sheriff and myself driving out there, and what we had observed inside the teacherage.

"Q. Give us again what you observed. A. Well, I observed the eyeglasses on the floor in the bedroom and the throw rugs pushed up together against each other, and the scuff marks on the floor.

"Q. Where were these throw rugs? A. The exact location of them.

"Q. Yes. What room were they in.? A. They were in the kitchen.

"Q. Go ahead now. A. And about the tennis shoe being outside on the porch and the drag trail, and the blood on the road and the watch. That's about it.

"Q. Did you relate to the Justice of the Peace any of the story told you by Mr. Pearson? A. Yes, I did. I believe I did. I really couldn't say unless I—yes, I did.

"Q. What did you tell the Justice of the Peace as it related to Mr. Pearson's story to you? A. About Mr. Pearson giving the subject a push in the approximate location of the blood and watch on the road there.

"Q. Anything else? A. And about the subject telling Dan Pearson where he was living, and maybe a description of the vehicle that the subject was driving, and I also believe what the subject looked like.

"Q. How about the fact that Mr. McKenzie used the telephone? Did you tell the Justice of the Peace about that? A. Yes, I did. I told him about the subject using the telephone and also about him being somewhat nervous and stating that he had stated to Dan

Pearson that he had ran a long ways, and that he talked very rapidly and seemed awfully nervous."

The only other testimony relevant here is that the county attorney asked him a question as to whether he had described defendant's clothing to the magistrate:

"Q. When you made your appearance before Judge Wolfe and were sworn, do you recall whether or not you testified as to the appearance of Duncan McKenzie on Monday evening—the physical appearance as to the clothes he was wearing? A. Yes, I believe that I did.

"Q. What did you get this information from? A. From Dan Pearson.

"Q. Do you recall what articles you described to Judge Wolfe? A. Well, I could—

"Q. I mean without referring to your notes. A. I would have to refer to my notes, Dave, to really make it positive."

The county attorney was also deposed, and although he did not testify at the hearing held to determine the initial probable cause, he did testify as to what he had heard at the hearing:

"Q. You heard both Mr. Hoover and the Justice of the Peace give their depositions here today. A. Yes, I did.

"Q. Is there anything different that you could relate to us that might have been left out or misunderstood or misstated here? A. I do recall that the Deputy did describe the clothing that Mr. McKenzie was wearing on that night to the Justice of the Peace, although the Justice of the Peace didn't recall that in his deposition.

"Q. That is the clothing that Mr. McKenzie was wearing on the night of the 21st? A. Yes.

"Q. And this information would have come from— A. Deputy Sheriff Hoover.

"Q. Through Dan Pearson. A. Yes.

"Q. It wasn't something that the Deputy knew himself? A. No.

"Q. Or that you knew yourself? A. No."

Magistrate Wolfe testified contrary to both deputy Hoover and county attorney Nelson on the question of a description of defendant's clothing being given to him through deputy Hoover:

"Q. Now with reference to those items, the brown long sleeve shirt, the jeans, and the rubber overshoe boots, what did Mr. Hoover tell you as to why they wanted these things? What did he tell you that led you to believe that these particular items were related to this case?

"* * *

"Q. What about the shirt and jeans and rubber overshoe boots? A. Well, I don't know that they mentioned those, to tell you the truth.

"Q. You didn't inquire of them as to why they wanted them, that you can recall? A. Not that I recall, no."

The question that naturally arises from this testimony is who is telling the truth and (even if one is not deliberately lying) how do you resolve the factual dispute? Do you believe the deputy sheriff and the county attorney or do you believe the magistrate? Certainly, three months later, when defense counsel was zeroing in on what happened, the deputy sheriff and county attorney suddenly knew they had their interests to protect—that somehow they had to save the arrest warrants and search warrants. The only reason this problem cropped up is because the magistrate allowed the oral nonrecorded testimony—and did not follow the law.

Concerning the "evidence of scuffling" in the teacherage, the magistrate testified that Hoover told him he found scuff marks on the floor, a pair of woman's glasses on the bedroom floor, and two "drop mats" were "out of place". He confirmed that Hoover told him a woman's tennis shoe was found outside the teacherage. He stated that Hoover told him there were drag marks leading from around the corner of the teacherage through an open field, under a fence, then into a barrow pit, and up to the road near where a woman's watch was found and a substance "that looked like it was blood".

In response to direct questions as to why he ordered defendant ar-

rested he replied that it was because his vehicle had been stalled "in the area of where those drag marks came up to the road and where this substance that appeared to be blood was located" and that "all the testimony led to Duncan McKenzie coming to Dan Pearson's place of residence and requesting help in getting his vehicle started, and that he appeared in Dan Pearson's residence in a state of excitement".

Thus we have a situation where the magistrate placed total credence and based his entire decision to issue an arrest warrant (and search warrant) on the hearsay testimony of deputy Hoover as to what Dan Pearson allegedly told deputy Hoover. There is not one hint in the record that either Hoover or Wolfe knew Pearson, or otherwise considered him to be a reliable person. In fact, Wolfe testified that he did not know Pearson. In any event, the ultimate conclusion which magistrate Wolfe reached when he decided to issue the warrants was that "a possibility that an assault had been committed".

Clearly, under any fair reading of the "facts" presented to the magistrate either in the application for search warrant, or in conjunction with the unrecorded testimony of deputy Hoover, there was no probable cause to issue the arrest warrant (or to issue the search warrant).

I now reach the issue of the search warrant itself. Much of what I have already discussed applied equally to the search warrant situation, and I will make passing reference. However, there are three key issues that bear on search warrants that do not bear on probable cause to issue a warrant of arrest. The first issue concerns the drastic departure by this Court from previous law which required that the grounds for issuance of a search warrant must be contained within the four corners of the sworn application for a search warrant or affidavits in support of the search warrant. That the majority opinion flies in the face of our constitution does not seem to move them at all. The second issue concerns the crucial inquiry or focal point when considering whether or not to issue a search warrant. The majority did not even touch on this issue, although it

is of the very essence of the requirement of probable cause to obtain a search warrant. The third issue concerns the conversion of the search warrant issued in this case into a general exploratory search warrant, limited only by the imagination of those who conducted the search.

To get some idea of the complete change this Court had made in the law of search and seizure in this case, and yet refuses to acknowledge it, it is necessary to put the cases they have cited in their proper context. I again quote the language of the majority opinion:

"* * * Here, there is an affidavit signed by the county attorney and made a part of both warrants. * * * In addition, the county attorney examined Deputy Hoover before the justice of the peace as to the facts he learned during the investigation. Here, unlike *Gray,* there was, in effect, sworn testimony by the county attorney and deputy sheriff in addition to the affidavit, *and the combination thereof established probable cause."* (Emphasis added.)

There is no question then that this Court held that sworn unrecorded testimony in addition to a signed "affidavit" is sufficient to establish probable cause not only for a warrant of arrest, but also for a search warrant. By so doing, the Court radically changed the law in this state.

The cases cited and misapplied by the majority must be placed in the context of the Montana constitution provisions relating to search and seizures. At the time *Petition of Gray,* (1970), 155 Mont. 510, 473 P.2d 532, was decided, Montana was still operating under its old 1889 constitution. The search and seizure provision, Article III, Section 7, provided:

"The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place or seize any person or thing shall issue without first describing the place to be searched, or the person or thing to be seized, nor without probable cause, supported by oath or affirmation, *reduced to writing."* (Emphasis added.)

*Gray* involved an interpretation of this constitutional provision

where sworn, *recorded* testimony was used to buttress an affidavit seeking a search warrant. Gray was arrested in May 1967 on a charge of burglary and two days later a deputy county attorney filed a "Complaint and Affidavit for Search Warrant". That document included the statement that the deputy county attorney "has actual knowledge and does believe" that certain stolen articles were at defendant's residence. In addition to this affidavit, a *recorded deposition* was taken from the deputy county attorney in the presence of the district judge. The judge issued the search warrant.

At the hearing on the motion to suppress the district judge stated he issued the warrants because of the affidavit and *deposition* and because of other information he had received in chambers from various officers as well as his personal knowledge and information concerning Gray. On appeal this Court held that the search warrant was "illegally issued and void". This Court looked to the *affidavit alone* to determine if it contained sufficient facts or circumstances to establish probable cause for issuance of the search warrant. This Court stated:

"Nor can the issuance of the search warrant be upheld on the basis of information not contained in the affidavit, the *affidavit itself being required to provide the exclusive support for issuance of the search warrant.*

"* * *

"* * * the sufficiency of an affidavit supporting a search warrant must be found within the four corners of the affidavit itself and reference may not be made to oral conversations that took place before the commissioner * * *." (Emphasis added.) 155 Mont. 519, 520, 473 P.2d 532, 537.

Clearly, under *Gray*, assuming it still to be the law today, magistrate Wolfe would not have been allowed to consider anything but the application signed by the county attorney, assuming that it in fact was an "affidavit".

In 1973, the new constitution went into effect in this state, and the language in the constitution did not change one word, although

a period was placed at the end of "seizures". Article II, Section 11, of the new constitution provides:

"The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation *reduced to writing.*" (Emphasis added.)

Since the constitutional provision did not change, it is only reasonable to assume that *Gray* continued to be the law. And that is precisely what this Court held in *State ex re. Townsend v. District Court,* (1975), 168 Mont. 357, 543 P.2d 193. There, the *application (affidavit)* for search warrant included a statement that an informant had advised the authorities that marijuana plants were growing in Townsend's residence and that a second informant had substantiated the information. There were no other written facts submitted to the magistrate. However, the magistrate orally examined the applicants for the search warrant (just as magistrate Wolfe examined deputy Hoover). And just as this case, the content of the oral examination was uncertain because it was not reported or transcribed in any fashion. In a special proceeding before this Court, Townsend contended that the affidavit was insufficient on the basis of Article II, Section 11, 1972 Montana Constitution, and on the basis of *State v. Gray,* supra. The State contended that sworn testimony to the magistrate at the time of the application for the search warrant could supplement an otherwise deficient affidavit. This Court, in an unanimous opinion, decided the issue as follows:

"*We now consider whether a deficient affidavit may be cured by responses to oral inquiry from a magistrate made at the time the application is submitted.* Relevant to this line of inquiry is Article II, Section 11, 1972 Montana Constitution which provides in pertinent part:

"'* * * No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the

person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.'

"Consistent with the requirement of a writing are the supporting statutory provisions, section 95-703, R.C.M.1947, defining the term 'search warrant' and section 95-704, R.C.M.1947, listing the grounds upon which a search warrant may issue.

"Here, it is respondents' contention that the officer's sworn testimony to the magistrate at the time of the application for the warrant may be used to supplement an application deficient on its face. We find this conclusion to be unsupported by Montana law. This question was considered in *Petition of Gray*, 155 Mont. 510, 519, 520, 473 P.2d 532, 537. There this Court ruled that the issuance of a search warrant cannot be upheld on the basis of information not contained in the affidavit, the affidavit itself providing the 'exclusive support' for such issuance. In doing so, Montana joined those states adhering to the so-called 'four corners' rule, set out in *Gray*:

"'* * * the sufficiency of the affidavit supporting a search warrant must be found within the four corners of the affidavit itself and references may not be made to oral conversations * * *. We see no reason to reach a contrary result in the instant case particularly, where as here, the conversations were unsworn, unwritten, and unsigned.'

"*Contemporaneous oral declarations to a magistrate cannot be used to bolster an insufficient affidavit in the attempt to establish probable cause, unless such declarations are sworn, signed, reduced to writing, and made a part of the affidavit.*" (Emphasis added.) *Townsend*, 1968 Mont. 362, 543 P.2d 193, 196.

Undoubtedly, this Court in *Townsend* affirmed the holding in *Gray*. There is no question that it was compelled to do so in light of our constitutional and statutory provisions. Indeed, as recently as 1976, in *State v. Thompson*, (1976), 169 Mont. 158, 545 P.2d 1070, this Court affirmed the requirements of *Gray* and *Townsend*, although the case turned on a different ground. In *Thompson* the county attorney prepared an application for a search warrant to

search Thompson's residence as a result of information received from an informant. Two police officers, the informant, and the county attorney went to the judge's home to procure the search warrant. The judge considered the application, examined one officer and the informant under oath, and issued the warrant. This Court upheld the search warrant but only because the sworn, written application for the search warrant signed by the county attorney was held *by itself* to be "wholly sufficient to establish probable cause". In so holding, this Court again approved its prior ruling in *Townsend* that "the affidavits for search warrant cannot be supplemented by oral statements to the magistrate" to establish probable cause.

*Gray, Townsend* and *Thompson* leave no doubt that probable cause for the issuance of the search warrant must be contained within the four corners of sworn, written documents presented to the magistrate to establish probable cause. The majority here used two pages apparently trying to distinguish *Gray* and *Townsend*— but in doing so failed to recognize the pivotal point of its decision: The Court allowed the application signed by county attorney Nelson (the so-called affidavit) to be supplemented by the sworn nonrecorded testimony of deputy Hoover (and the nonexisting testimony of the county attorney) to establish probable cause. That is precisely what *Gray* and *Townsend*, both adhering to the four corners doctrine, prohibited.

In addition to the Court's failure to recognize the obvious, there are several factual errors contained in its apparent attempt to distinguish *Gray* and *Townsend*.

As to *Townsend*, the majority stated: "In *Townsend nothing was reduced to writing.* Here, there is an *affidavit* signed by the county attorney and made a part of both warrants. * * *" (Emphasis added.) This is patently false. The clear impression in *Townsend* is that there *was* an *affidavit in writing*, submitted to the magistrate but by itself it did not establish probable cause, and therefore the oral evidence taken by the magistrate could not be allowed to supplement the insufficient affidavit. The Court held that the combina-

tion thereof could not establish probable cause. Assuming moreover, that there was no writing in *Townsend*, it does not detract from the Court's holding therein that any application for a search warrant must be in writing and sworn to, and that the probable cause must be contained within the four corners of the writing itself.

As to *Gray*, the majority stated:

"In addition [apparently in addition to the so-called affidavit] the county attorney examined Deputy Hoover before the justice of the peace as to facts he learned during the investigation. Here, unlike *Gray*, there was, in effect, *sworn testimony by the county attorney and deputy sheriff in addition to the affidavit*, and *the combination thereof established probable cause. * * *"* (Emphasis added.)

What nonsense. In *Gray*, in addition to an *actual* affidavit filed by the deputy county attorney, the deputy county attorney gave *recorded, sworn testimony* before the district judge as part of the probable cause application. This Court expressly held that the four corners doctrine prohibited any consideration of the recorded sworn testimony of the deputy county attorney.

There is yet another factor here, since the majority relies so heavily on the county attorney's "affidavit". It would seem that in such event, if this Court is going to allow a combination of oral nonrecorded testimony in addition to an "affidavit" to establish probable cause to obtain a search warrant, that in such event, the "affidavit" should in fact be an "affidavit". Here, the proof is unequivocal that the county attorney simply appeared before his own secretary and acknowledged to her that he signed the document involved. (See statement of facts, supra.)

In addition to the foregoing, in their attempt to muddy the waters as to the application of *Gray*, and *Townsend* to the facts of this case, the majority has made several other factual errors. I have, however, sufficiently discussed them elsewhere.

*Gray, Townsend* and *Thompson* leave no doubt that defendant's motion to suppress should have been granted. This Court neither

had the courage to apply these cases to the benefit of the defendant, nor, on the other hand, to expressly overrule them. Of course, by keeping the door open under the *guise* of *distinguishing Gray* and *Townsend*, this Court has served notice on potential defendants that if they are charged with a less gruesome crime they may get the benefit of these cases. By failing to either honestly apply these cases to the benefit of defendant or by failing to overrule these cases this Court has perpetrated a cruel hoax on the defendant.

The dishonesty of the majority opinion is manifest by its failure to cover two factors which are absolutely indispensable to finding probable cause to issue a search warrant — namely, that the items sought are in fact seizable by virtue of being connected with some criminal activity, *and* that the items can be found at the place to be searched. Here the object of the search (at least ostensibly) was to find defendant's clothing and Lana Harding's clothing. There is not one reference in the opinion that clothing was the object of the search. Moreover, there is not one reference in the opinion as to what evidence was used to determine that the clothing was probably in the defendant's home or in his pickup truck. The reason is obvious — to discuss these crucial factors would be to admit that there was no probable cause.

The application for search warrant confines the object of the search to that of looking for clothing. However, the application does not state one fact that would lead one to conclude that the clothing sought was either in defendant's home or in his pickup truck. (Neither did the oral testimony of deputy Hoover cover this point.) The application for search warrant specifically stated in the prayer:

"* * * That the object of the search would be to seize the instruments of the assault of the said LANA HARDING, including, but not limited to, the evidence of the whereabouts of the said LANA HARDING, to-wit: a brown long sleeve shirt, jeans and rubber overshoe boots, worn by the Defendant; and black coat, purple sweater, woman's blouse with flower design, woman's pink slacks and woman's red and white striped tennis shoe, and any other contraband articles."

And the search warrant specifically set out the clothing which was the object of the search and as to that the magistrate found:

"I am satisfied that there is probable cause to believe that the property described is in or upon the said described real property and 1950 black Dodge pickup and further upon the sworn testimony of Deputy Sheriff, Jerry Hoover, taken before this judge;"

The record is not only deficient, it is devoid of any evidence from which the magistrate could conclude that the clothing was either in the house or the pickup truck.

Given the total lack of candor in dealing with the facts it is not surprising then that the majority has overlooked the fundamental distinction between probable cause to obtain an arrest warrant and probable cause to issue a search warrant. To justify an arrest warrant the evidence presented to the magistrate must relate to the guilt of the person to be arrested. On the other hand, to justify a search warrant, the evidence presented to the magistrate must relate to the items sought and the location of the items sought. The Fourth Amendment to the United States Constitution and Article II, Section 11 of the 1972 Montana Constitution both provide that no warrant shall issue unless there is "probable cause".

The issue of probable cause for a search warrant then *becomes—probable cause as to what?* Does it mean that because there is probable cause to arrest a person for a crime that there is ipso facto probable cause to search his home and other belongings? Does it mean that if a person has already been arrested on probable cause that his arrest ipso facto converts into a right to search his home or other belongings? Surely, this cannot be so. Probable cause in the context of a search warrant means that there is sufficient reason to search a particular place for particular items. The evidentiary foundation must be directed toward that end. If not satisfied, there is no basis to issue a search warrant. It is that simple.

The distinctions between probable cause to issue an arrest warrant and probable cause to issue a search warrant, have been discussed as follows:

"Basic to search warrant protections is the requirement of prob-

able cause. Its function is to guarantee a substantial probability that the invasions involved in the search will be justified by discovery of offending items. *Two conclusions necessary to the issuance of the warrant must be supported by substantial evidence: that the items sought are in fact seizable by virtue of being connected with criminal activity, and that the items will be found in the place to be searched.* By comparison, the right of arrest arises only when a crime is committed or attempted in the presence of an arresting officer or when the officer has 'reasonable grounds to believe'—sometimes stated 'probable cause to believe'—that a felony has been committed by the person to be arrested. Although it would appear that the conclusions which justify either arrest or the issuance of a search warrant must be supported by evidence of the same degree of probity, it is clear that the conclusions themselves are not identical.

"In the case of arrest, the conclusion concerns the guilt of the arrestee, whereas in the case of search warrants, the conclusions go to the connection of the items sought with crime and to their present location." Comment, 28 U.Chi.L.Rev. 664, 687 (1961). (Emphasis added.)

The following comment in the same article, was made concerning probable cause to search incident to arrest. However, it applies equally as well to search warrants in relation to the probability that the items sought are at the place to be searched:

"What remains to be supported by probable cause in the case of search incident to arrest is the conclusion that the fruits or instrumentalities sought will be found in the place of arrest. Here, it must be admitted that however reliable may be the inferences from the commission of a crime to the conclusion that certain types of fruits or instrumentalities were involved, the inference from the latter proposition to the conclusion that those items will be found at the place of arrest is far from compelling. Indeed, the probability that fruits or instrumentalities will be found at the place of arrest is only slightly greater than the probability that those items will be found any place over which the arrestee has control." Comment, U.Chi. L.Rev. 664, 688.

In this case no evidence was present as to the probability of the clothing being at the home or in the pickup truck. Moreover, logically speaking, it would be highly improbable that her clothing would be there. The probability would be that a defendant would have destroyed them or disposed of them in a place least likely to implicate the defendant.

In a case involving search incident to arrest, but which reasoning applies equally to that of obtaining a search warrant, the court in *United States v. Antonelli Fireworks Co.* (1943), D.C., 53 F.Supp. 870, held that "the right to search and the validity of the seizure are not dependent on the right to arrest but on the reasonable cause the arresting officer has to believe that the articles subject to seizure are concealed at the place of arrest." And so is the validity of a search warrant judged by the evidence of probable cause stated to the magistrate that the objects sought are at the place to be searched.

The test for probable cause to obtain a search warrant was stated in *People v. Wilson* (1967), 256 Cal.App.2d 411, 64 Cal.Rptr. 172, cert. den. 391 U.S. 903, 88 S.Ct. 1653, 20 L.Ed.2d 418:

"* * * whether or not the magistrate could form a reasonable belief that the articles sought were present at the place to be searched."

Moreover, there are evidentiary limitations on the extent to which hearsay evidence can be used to satisfy this requirement. In *Grimm v. State* (1969), 6 Md.App. 321, 251 A.2d 230, cert. den. 397 U.S. 1001, 90 S.Ct. 1150, 25 L.Ed.2d 412, the court held that where the affidavit was based on hearsay, it must set out some of the underlying circumstances by which the affiant (and ultimately the magistrate) could reasonably conclude that the hearsay information was reliable and that the items sought were at the place to be searched. In the present case, there was absolutely no evidence provided to show that the clothing was either in defendant's home or in his pickup truck. Moreover, the clothing descriptions provided the magistrate are based entirely on uncorroborated hearsay.

One cannot tell from a reading of the application where the

county attorney obtained the clothing descriptions. Indeed, the body of the application does not mention either Lana Harding's clothing or defendant's clothing. Only in the prayer seeking to move the court's discretion is any mention made of either the defendant's or Lana Harding's clothing. For some strange reason the clothing is designated as an "instrument of the assault". The clear implication from reading the application as a whole is that a member of the sheriff's office provided the clothing description to the county attorney. But one cannot tell where the sheriff's office obtained the information.

The unrecorded testimony of deputy Hoover (as later developed through his deposition) is that he obtained defendant's clothing description from Dan Pearson. But not one mention is made as to Dan Pearson's reliability as a source of information. Moreover, the testimony of magistrate Wolfe is that he did not recall Hoover giving him a description of the clothing worn by the defendant.

Although it appears from the deposition of magistrate Wolfe that deputy Hoover provided him with a description of the clothing worn by Lana Harding, there is not one mention of the person or persons from whom deputy Hoover obtained this information, nor of the reliability of this information. There can be no question that the clothing descriptions provided the magistrate were based on uncorroborated hearsay.

The basic interest protected by the Fourth Amendment is the "right to privacy". Only "probable cause" (in addition to the formalities compelled by the constitutions or statutes) can make a search "reasonable" and thereby justify governmental intrusion into this right. Montana has similar guarantees in Article II, Section 11 of its 1972 constitution. In addition, a separate "right of privacy" is recognized by Article II, Section 10, which provides:

"The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."

In this case we cannot separate the search of defendant's home from the search of the home that also belonged to his wife and chil-

dren. They too have the "right of privacy". (As the sheriff testified when he commenced the search — defendant's wife "went quite hysterical".) Clearly, the right of privacy provision of Montana's Constitution is an additional reason why, before a search warrant is obtained, the State must, at a minimum be required to show that there are seizable items (items relating to criminal conduct) at the place to be searched. Absent this showing, the State has failed to show a "compelling state interest".

The Fourth Amendment to the United States Constitution and Article II, Section 11, of the 1972 Montana Constitution recognize two distinct rights. The first right is that of an individual to be free from "unreasonable" seizures (arrests) of his person. The second right is that of an individual to be free from "unreasonable" searches and seizures at his home, or of his belongings in some other place. Assuming probable cause to arrest in this case, defendant's right to be free (a type of privacy) would be forfeited (at least temporarily). But his second right to be free from unreasonable searches and seizures would not be forfeited automatically by virtue of his forfeiture of his first right. Under the facts of this case the defendant's right to privacy remained intact until the State showed probable cause to a magistrate of why the defendant has forfeited this right. Until such time no search warrant could legally issue for his home or his pickup truck. The only way that the right to invade defendant's privacy could be shown was by making a sufficient showing that there were seizable items at the place to be searched. In the case of the home particularly, it is not just the defendant's right of privacy that deserves protection — it is the right of privacy of his family. This right cannot be guaranteed unless these minimum requirements of probable cause are observed — inviolate. ·

Defendant next attacks the nature and extent of the search conducted by the sheriff and his deputies. Once armed with the search warrant (ostensibly authorizing the sheriff to search defendant's home and truck for defendant's clothes and Lana Harding's clothes) the sheriff and his deputies drove to defendant's home and commenced a dragnet type operation which, under any circum-

stances, must be classified as a general exploratory search. I have already stated the general nature of this search and will not repeat the facts except to emphasize that this included impounding defendant's truck and all its contents, the seizure of the clothing defendant was actually wearing at the time, the seizure of a lock of defendant's head hair, and just for good measure the sheriff himself "plucked" pubic hairs from defendant. When one conducts a search so general in scope, the evidence cannot be neatly tucked away into categories, where some of it is admissible, and some of it is not. The evidence should have been suppressed.

In *Marron v. United States* (1927), 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231, the United States Supreme Court outlawed general exploratory searches:

"The requirement that warrants shall particularly describe the things to be seized makes general search warrants under them *impossible* and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant. * * *" (Emphasis added.) 275 U.S. 196, 48 S.Ct. 76.

The court has made certain exceptions to seizing items not specifically listed on the search warrant — but none that would apply here. The case of *Warden v. Hayden* (1967), 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, did make the situation a little confusing. Prior to *Warden v. Hayden*, it had already been held that contraband, or the "fruits" or "instrumentalities" of a crime could be seized, either while searching pursuant to a lawful arrest, and presumably to searching pursuant to a search warrant. *Warden v. Hayden* took another step and held that "mere evidence" could also be seized under the same circumstances. The only requirement apparently is that there be probable cause to believe that the "mere evidence" has some connection to criminal behavior.

However, the United States Supreme Court has not done away with the prohibition against general exploratory searches. In *Stanley v. Georgia* (1969), 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542, the court relied on *Marron*, supra, as prohibiting general ex-

ploratory searches. In *Stanley* the court also quoted from *United States v. Rabinowitz* (1950), 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, for the principle that "exploratory searches * * * cannot be undertaken by officers, with or without a warrant." The court concluded in *Stanley* that the record "presents a bald violation of that constitutional rule". As bald as *Stanley*, was, I cannot conceive of a balder situation than exists in this case. The facts speak for themselves.

There are moreover, compelling reasons to maintain this rule against general exploratory searches if the Fourth Amendment (and similar state constitutional provisions, Article II, Section 11, 1972 Montana Constitution) are to have any meaning. Those reasons were set forth in *People v. Baker* (1968), 23 N.Y.2d 307, 296 N.Y.S.2d 745, 244 N.E.2d 232, where the court specifically relied on *Marron* to hold that a search was too broad. In *Baker* a detective in the process of serving and executing a search warrant for a knife, came upon and seized a sweater which was similar to the description given by the victim as worn by the attacker. The court held that the seizure of the sweater was not authorized and suppressed the evidence. In relying on *Marron*, and distinguishing *Warden v. Hayden*, supra, the court stated:

"There can be no question that, had the officer returned, he could have obtained a warrant to seize the sweater, since, combined with the information [the victim] had given him, his personal observations, while lawfully in the apartment, would have authorized the issuance of a warrant for the seizure of the sweater. * * *

"The People argue that the Supreme Court's overruling of the 'mere evidence' rule supports the seizure of the jacket here. This is not so. If anything, it reinforces the strength and need for the *Marron* holding.

"*Hayden* did not involve a search warrant, and at no point was *Marron* discussed by the court. Moreover, *Marron* was cited with approval in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040, decided after *Hayden* * * *. Also in *Hayden* the court's opinion makes it quite clear that there the basis of its con-

clusion was that, since the exigencies of the situation justified the police in entering the house without a warrant in search of a suspected armed felon and, as probable cause existed, there was no reason to distinguish between an intrusion to secure mere evidence as distinguished from fruits, instrumentalities, or contraband, which was clearly authorized. * * *

"Here, however, the authorization for the intrusion was very narrow and circumspect — for a weapon used during the commission of a crime — and there were no exigent circumstances requiring an immediate response. *To permit the seizure of unauthorized items in the course of a lawful search would eliminate the constitutional requirement of 'particularity' and would open the door for general searches abhorred since colonial days and banned by both the Federal and State Constitutions.* The right to search for and seize one item does not permit the inference that there is probable cause for other items. *More importantly, now that seizure of 'mere evidence' is authorized, courts will have to be more diligent in assuring that the search warrant does not degenerate into a subterfuge for general exploratory searches for evidence, thereby destroying the people's security in their persons, houses, papers, and effects, guaranteed by the Fourth Amendment.*" (Emphasis added.)

How true that is when applied to the present case. Even assuming probable cause to search for the clothing of defendant and Lana Harding, the police were authorized only to seize that clothing. But more than this, the nature of the search conducted in this case proves with certainty that the sheriff was conducting a general dragnet operation. If the United States and Montana Constitutions do not prohibit this kind of activity, they prohibit no activity at all.

The testimony of magistrate Wolfe and sheriff Hammermeister is revealing as to the scope of authority they believe was conferred by the issuance of the search warrant. Magistrate Wolfe was examined at his deposition as to the authority he conferred on the sheriff and he testified: "I just authorized the search of one [the pickup truck]. I don't believe I authorized the seizure of one." And neither did he authorize (nor could he) the seizure of almost all the items listed on

the sheriff's return as having been seized pursuant to the search warrant. In response to this line of inquiry, the magistrate testified: "No; I just authorized what was listed on that Search Warrant."

In addition to the particular clothing to be seized, the application asked for and the search warrant contained a phrase: "and any other contraband". This was seized upon both by the magistrate and by the sheriff as authority to conduct a general, exploratory search. Magistrate Wolfe testified:

"Q. What does 'any other contraband articles' mean? What did it mean to you when you signed this? A. I surmised it would be any items that—

"Q. That the Sheriff wanted to take? A. That the Sheriff felt was pertinent to his investigation and also pertinent to this specific search.

"Q. Are you telling me that based upon the Warrant you were giving him permission to take anything he wanted to take that he thought might be related to this case? A. That is correct."

It is clear that magistrate Wolfe thought he had authority to and thought he did authorize a general exploratory search by virtue of the phrase "any other contraband".

The testimony of sheriff Hammermeister at his deposition is equally disheartening. While being examined concerning the seizure of boots, the following exchange took place:

"Q. The Search Warrant included those boots? A. It didn't specify them but I felt it was included.

"Q. What gave you reason to feel it included the boots? A. Can I read the Search Warrant?

"Q. Yes. (Handing Search Warrant to deponent.) A. (Deponent examining same.) Well, I felt it would fit in here. For one thing it was a search for evidence and it specifically named some items and then said, 'and any other contraband articles.'

"Q. You felt these boots were contraband articles? A. Well, I'm not certain what contraband means, but I felt it was evidence."

Thereafter, sheriff Hammermeister was examined on the list of

items which he had seized which were not listed on the search warrant. The sum total of his answers to all these can be fairly stated by his answer to one of the questions: "Well, again, I thought it was evidence or whatever contraband means."

The search warrant with the magic phrase "and any other contraband" was, according to sheriff Hammermeister, all the authority he needed to conduct his dragnet operation. His attitude is illustrated by his testimony at the conclusion of going through the list of items on the return to the search warrant:

"Q. This statement on the Search Warrant, 'and any other contraband articles' you felt would give you the authority to seize any and all property you might find and wished to take? A. I'm not sure what contraband means, but in my mind —

"Q. I'm not asking you to define it. I am asking you this: When you executed the Search Warrant was it in your mind that this gave you the authority to seize any property you wanted to take? A. Well, the wording says 'and any other contraband' and I figured that covered what we took in the way of evidence and items that we took.

"Q. Anything that you wanted to take? A. Well, if it was relevant to the case.

"Q. But deemed in your own mind as to whether or not it was relevant? A. Yes.

"Q. If you thought that the kitchen stove was relevant you would have taken that? A. Yes, if I felt that the stove was — well, if I felt that I could justify the kitchen stove as relevant to the case, yes.

"Q. You felt that this would have given you authority to take that, or the radio or TV? A. If it fell into either evidence or contraband.

"Q. But as you saw it? A. Yes."

If the United States Constitution and the Montana Constitution do not condemn what took place in this case, then we might just as well do away with our Bill of Rights — for they are worth no more than the paper on which they are written.

388

The entire record of this arrest and search and seizure in this case is replete with errors of constitutional dimension. Most of them were caused by an abundance of ignorance — ignorance of the basic requirements of the United States Constitution, the Montana Constitution, statutes of this state, and case law of this state. However, the District Court should not have ratified this ignorance, and it is unconscionable that we should have done so. By so doing we have allowed the defendant's rights to disappear into the fog of ignorance. But just as important, assuming that the constitutional, statutory and case law requirements as to procedure were met in this case, the glaring misstatements of fact in the majority opinion have obliterated any requirement of probable cause to obtain a warrant of arrest or a search warrant. All that is needed is a determination made after a conviction that a gruesome crime has been committed. Henceforth, the nature of the crime will be the governing standard of this Court as to whether a defendant will be given the protection of his basic constitutional rights.

The grave injustice committed against the defendant by failing to suppress the illegally seized evidence is compounded ten fold by the majority's decision upholding the constitutionality of Montana's death penalty scheme. In fact, the entire statutory scheme relating to the death penalty revolves around five words — "*unless there are mitigating circumstances.*" I cannot conceive that those magic five words are adequate to constitutionally impose the death penalty upon defendant. If these so-called mitigating circumstances are to have any meaning, they must also be accompanied by mandatory sentencing procedures designed to elicit the mitigating circumstances, and mandatory appellate review procedures designed to fairly review the entire process. In this respect Montana's statutes then in effect cannot possibly pass constitutional muster.

After *Furman v. Georgia*, (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, the Montana legislature responded by enacting two death penalty statutes which allowed the death penalty to be inflicted in certain cases "unless there are mitigating circumstances". Section 94-5-105, R.C.M. 1947, provided the death penal-

ty for certain classes of deliberate homicide and section 94-5-304, R.C.M.1947, provided the death penalty for a certain class of aggravated kidnapping. The legislature did not enact any statutes providing for mandatory hearings on the question of aggravation and mitigation. Nor did it enact any statutes providing for mandatory appellate review of a sentence of death. What the majority has done is hold that Montana's general criminal procedure statutes, enacted in 1967, are sufficient to provide the protections demanded by the cases of *Gregg v. Georgia*, (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida*, (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; and *Jurek v. Texas*, (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. A reading of these cases and the statutory provisions approved therein, convinces me beyond any doubt that Montana's general criminal procedure statutes are devoid of any redeeming value to save them from constitutional attack.

The majority recognizes the demands of *Gregg*, supra, by quoting what it considers to be its essential directive:

"*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. 189, 96 S.Ct. 2932.

The majority recognizes that Montana's statutes are not mandatory death penalties, and thus do not lose their validity because of the United States Supreme Court decisions in *Coker v. Georgia*, (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982, and *Harry Roberts v. Louisiana*, (1977), 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637. The next step the majority takes is to cite *Harry Roberts* as holding that for a capital punishment statute to be substantively valid, there must be a procedure allowing for a consideration of mitigating circumstances. What the majority has ignored, however, is that *Gregg*, *Proffitt* and *Jurek* demand that there be a mandatory sentencing hearing allowing for a consideration of mitigating circumstances, and that there be mandatory and ex-

pedited appellate review of all death sentences. When measured by these standards, Montana's statutes fail miserably.

The failure of the majority is that they do not analyze the true demands of *Gregg, Jurek* and *Proffitt.* The majority analyzes the requirements as follows:

"First, there must be at least one statutory aggravating circumstance before a death sentence may be considered. Second, the defense must be afforded the opportunity to bring before the sentencing body at a separate sentencing hearing any mitigating circumstances relating to the individual defendant. Third, there must be available prompt judicial review of the sentencing decision by a court of statewide jurisdiction, providing a means to promote the evenhand, rational and consistent imposition of death sentences under the law."

I do not disagree with these general conclusions as to the demands of *Gregg, Proffitt* and *Jurek.* However, I disagree totally with the majority in their conclusion that the Montana statutory scheme then in effect provided these procedural and substantive protections. The majority sums up the salient features of the Montana statutory scheme by stating:

"Although *Montana's statutory scheme is unlike those approved by the United States Supreme Court in Gregg, Proffitt,* and *Jurek,* we see no substantive failure of Montana's statutory scheme to comply with constitutional standards. * * * Our system is neither wholly mandatory nor wholly discretionary. There are precise statutory requirements for finding aggravating and mitigating circumstances, and a procedure for flushing out the facts with respect to such circumstances. There is appellate review at two levels, insuring that the sentence is both legal and proportional to the nature and class of crime. In short, we believe that the Montana statutory scheme is existence at the time of the crimes herein, affords defendant the procedural safeguards necessary to protect his substantive rights to be sentenced without arbitrariness or caprice.

"Therefore, we hold the death penalty statutes in question in this case are constitutional under the United States constitutional re-

quirements. They are constitutional on their face and as applied to this defendant." (Emphasis added.)

The only accurate statement is that which I have emphasized.

The conclusions the majority reaches can have come about for only two reasons: First, the majority failed to read the statutes that were involved in *Gregg*, *Proffitt* and *Jurek*. Second, the majority failed to read the Montana statutes which it upholds as being constitutional. One need only notice the conspicuous absence of analysis of the Georgia, Florida and Texas statutes and the same failure to cite and quote from Montana's statutes which are upheld. Without this analysis the reader is in no position to compare the statutes and draw his conclusions as to the merits of the majority's conclusions.

The first requirement is that there be at least one statutory aggravating circumstance. On its face, Montana's statutes meet this requirement. The homicide statute sets out six aggravating circumstances, any one of which is sufficient for the court to impose the death sentence. (Section 94-5-104(1)(a) through (f).). The aggravating circumstance, namely that the victim be dead as a result of the kidnapping. (Section 95-5-304.) However, the statutes are silent as to whether it is the jury or the judge who must make the determination of whether the aggravating circumstance exists. This uncertainty is illustrated by what happened in this case.

The homocide statute is silent as to whether the judge or the jury makes the finding of aggravating circumstance. The statutory aggravating circumstance of "committed by means of torture" was applied in this case. At the sentencing hearing, the district judge made that finding,.and then sentenced defendant to death for aggravated homicide. But just the opposite procedure was used the in the aggravated kidnapping conviction. The statute provided:

"*A court* shall impose the sentence of death following conviction of aggravated kidnapping *if it finds that the victim is dead as the result of the criminal conduct * * *.*" (Emphasis added.) Section 94-5-304, R.C.M.1947.

This section states it is the judge, as opposed to the jury, who is to

make the finding "that the victim is dead as a result of the criminal conduct." However, in this case, the court, in addition to the general verdict, submitted a special interrogatory to the jury. The jury found the victim was dead as a result of the criminal conduct. In imposing the death penalty, the court simply relied on and adopted the jury's finding. I do not believe this procedure is contemplated by the statute.

Moreover, the procedure adopted by the District Court in submitting a special interrogatory to the jury is of doubtful validity in the state and should not be encouraged. In criminal cases general verdicts only should be given to the jury and they should not be cluttered by special interrogatories. Section 95-1909(h), R.C.M. 1947, provides that in criminal cases a verdict must be a general verdict. To adopt the practice of submitting special interrogatories to the jury as side issues can only erode the policy of this statute requiring general verdicts in criminal cases.

The second requirement of *Gregg, Proffitt* and *Jurek*, as recognized by the majority is that the defendant must have an opportunity after conviction at a separate hearing, to present evidence of mitigating circumstances. The majority satisfies this requirement by combining the "unless there are mitigating circumstances" language in the homicide and kidnapping statutes, with the criminal procedure statutes relating to presentence investigations. The only section the majority refers to is section 95-2204, R.C.M.1947, and since it is not quoted in full, one cannot tell if it actually applies. Before analyzing these presentence investigation statutes, one must first know what requirements are laid down in *Gregg, Proffitt* and *Jurek*. This can only be done by discussing the statutes which were approved.

In *Gregg v. Georgia*, supra, there was a separate mandated sentencing hearing to inquire into circumstances of mitigation. After a verdict of guilty by a jury or a finding of guilty in a nonjury trial, the statute required that there be a separate sentencing hearing with the inquiry limited to the issue of whether the defendant would be sentenced to death. Section 27-2503, Ga.Code Ann.

(Supp.1975). The jury hears the evidence presented on the issue of aggravation and mitigation (Section 27-2534.1), is instructed by the judge, and then goes into deliberation to determine if any aggravating or mitigating circumstances are present and whether to recommend mercy for the defendant. (Section 27-2503(b).) If the jury recommends the death penalty it must designate the aggravating circumstances in writing and find them beyond a reasonable doubt, and if it is a nonjury case the trial court must specify the aggravating circumstances by written findings and find each of them beyond a reasonable doubt.

In *Proffitt v. Florida*, supra, after a jury conviction the statutory scheme required the trial judge to conduct a sentencing hearing where he was to consider a list of seven mitigating circumstances.

In *Proffitt*, the statute required the judge to hold a sentencing hearing before a jury unless the jury hearing is waived by defendant. (Section 921.141(1) Fla.Stat.Ann.) The jury is required to consider both aggravating circumstances under section 921.141(5) and mitigating circumstances under section 921.141(6) and determine if the mitigating circumstances outweigh the aggravating circumstances, and make a determination if the death penalty should be imposed. (Section 921.141(2).) The trial court is authorized to overrule the jury recommendations, but if it did so and imposed the death sentence, it is required to set out specific findings of fact showing how the aggravating circumstances outweigh the mitigating circumstances. (Section 921.141(3).)

In *Jurek v. Texas*, supra, the statutory scheme requires a sentencing hearing before the trial judge and jury. The statute confines the death penalty to five narrowly defined classes of homicide. (Art. 37.071, Tex.Code Crim.Proc.) The jury is given a list of three statutorily defined issues, and if the trial court is to impose the death penalty, the jury must answer each question in the affirmative, beyond a reasonable doubt, by a unanimous jury. (Art. 37.071.) Although the statute does not direct the jury to consider any mitigating circumstances, the United States Supreme Court ruled tha the list of three questions is sufficient to bring before the jury any mitigating circumstances.

Clearly, these cases have a minimum requirement that the statutes mandate a post-conviction sentencing hearing, and at that hearing the defendant must have an opportunity to present evidence in mitigation of the death sentence. Measured against this requirement the Montana statutes are grossly insufficient to withstand a constitutional attack. Nor do I think the majority can breathe life into those statutes by concluding that they are different than what they are in fact.

We must remember that Montana's statutes on the death penalty contain no provisions whatsoever for a post-conviction hearing, much less a mandatory hearing. However, the majority ignores this deficiency, and in the same breath would like the reader to believe that there is a statute which allows the defendant to request a post-conviction hearing if he desires:

"* * * Finally, the defendant is authorized to seek a hearing to present to the court his testimony and evidence in mitigation of punishment."

Not one statute is cited and not one case is cited. Surely, this bald, unsubstantiated statement cannot be considered to comply with the requirements of *Gregg, Proffitt* and *Jurek*. It is my understanding that the statutes involved, must, by their own terms, contain provisions for a mandatory post-conviction hearing on the issue of aggravation or mitigation. Certainly, we all know that any defense lawyer worth his salt would ask for a hearing even in the absence of a statute authorizing it. And most likely, a District Court would grant the motion. However, we cannot assume that every defendant who may be sentenced to death is represented by a competent attorney or that all judges would grant a hearing. The statutes themselves must provide for the hearing.

In addition to relying on a nonstatutory basis for a post-conviction hearing, the majority lays great stress on the function and use of the presentence investigation. The majority totally misses the point, because, if they had bothered to read the statutes, they would see that a presentence investigation report is not required in all felony cases or in any felony cases. Whether one is or-

dered is entirely within the discretion of the District Court judge who will be doing the sentencing.

There are three statutes concerning presentence investigations, all enacted in 1967. Section 95-2303, R.C.M.1947, sets out the circumstances under which a District Court, in its discretion can order a presentence investigation report. Section 95-2204, R.C.M. 1947, sets out the kind of information that must be included in the report. Finally, section 95-2205, R.C.M.1947, determines the use to which such report can be put. It is unfortunate that the majority tries to leave the impression with the reader that a presentence investigation is required in all felony cases:

"* * * First, both death penalty statutes provide that the court 'shall' impose a sentence of death 'unless there are mitigating circumstances'. Defendant urges that the 'unless' clause may purport to circumscribe the sentencing judge's authority, but there are no guiding standards nor sources of information provided for. *This argument ignores the second statutory provision relevant here— that is, the presentence investigation report to be delivered to and considered by the sentencing court in felony cases.* * * * Section 95-2204, R.C.M.1947, provides the report shall contain information respecting 'the characteristics, circumstances, needs, and potentialities of the defendant; his criminal record and social history; the circumstances of the offense; * * * and the harm to the victim, his immediate family, and the community.' The report provides the sentencing authority with whatever circumstances may exist in mitigation of the defendant's conduct.

"Reading the two provisions together, *the sentencing court is required to consider mitigating circumstances and is required to consider the presentence investigation report which must contain any matters relevant to mitigation.* * * *" (Emphasis added.)

It is clear that majority intends to give the reader the impression that presentence investigations are required in felony cases, and ipso facto, in all situations where the death penalty might be imposed. However, a reading of the statutes shows that presentence investigations are not required and neither do the statutes provide

the procedural and substantive protection mandated by *Gregg*, *Proffitt* and *Jurek*. The statutes are:

"92-2203. *Presentence investigations*. No defendant convicted of a crime which may result in commitment for one (1)year or more in the state prison, shall be sentenced or otherwise disposed of before a written report of investigation by a probation is presented to and considered by the court, *unless the court deems such report unnecessary*. The court may, in its discretion, order a presentence investigation for a defendant convicted of any lesser crime or offense." (Emphasis added).

"95-2204. *Content of investigation. Whenever an investigation is required*, the probation officer shall promptly inquire into the characteristics, circumstances, needs, and potentialities of the defendant; his criminal record and social history; the circumstances of the offense; the time the defendant has been in detention; and the harm to the victim, his immediate family, and the community. All local and state mental and correctional institutions, courts, and police agencies shall furnish the probation officer on request the defendant's criminal record and other relevant information. The investigation shall include a physical and mental examination of the defendant when it is desirable in the opinion of the court." (Emphasis added.)

"95-2205. *Availability of the report to defendant and others*. The *judge may, in his discretion*, make the investigation report or parts of it available to the defendants or others, while concealing the identity of persons who provided confidential information. If the court discloses the identity of persons who provided information, the judge may, *in his discretion*, allow the defendant to cross-examine those who rendered information. Such reports shall be part of the record but shall be sealed and opened only on order of the court.

"If a defendant is committed to a state institution the investigation report shall be sent to the institution at the time of commitment." (Emphasis added.)

Obviously, there is no statutory basis to have a post-conviction

hearing on the question of aggravation or mitigation. That diligent defense counsel may request one does not remedy a defective statute. Moreover, a procedure for "flushing out the facts" is not provided by a presentence investigation report when a judge in his discretion may dispense with such report. (Section 95-2203.) Even assuming a trial judge did order a report, there is no statutory procedure whereby the defendant may challenge the findings and conclusions contained in the report. It is not at all clear under section 95-2205 that a defendant and his lawyer have a right to a copy of the presentence investigation report. The statute clearly allows the court to withhold the "identity of persons who provided confidential information". And if there is a hearing, the trial judge has the right to refuse to allow defendant to cross-examine those whose provided information to the probation officer. These defects may be a lack of procedural due process in any criminal case. In any event, in a capital punishment case they cannot be tolerated.

The same kind of defects are carried over to the appellate judicial review which the majority has approved in this case. When analyzed, the statutes simply cannot fulfill the demands of *Gregg*, *Proffitt* and *Jurek*.

In *Gregg v. Georgia*, supra, a statute directed mandatory expedited review by the Georgia Supreme Court. The statute provided in relevant part:

"Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence *shall be reviewed* on the record by the Supreme Court of Georgia * * *." Ga.Code Ann. (Supp.1975) 27-2537(a). (Emphasis added.)

Review of the sentence was in addition to the review of the conviction itself. In the event an appeal was taken from the conviction itself, the appeal and sentence review are consolidated for review (27-2537(i)). The statute also set out the scope of review and the factors to be considered in reviewing the death sentence, (27-2537 (c)(1) through (3). And finally, the statute provided what action the court could take in reviewing the death sentence, (27-2537(e)(1) and (2)).

In *Proffitt v. Florida,* supra, the statute provided for mandatory expedited review by the Florida Supreme Court.

"The *judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida* within 60 days after certification by the sentencing court of the entire record, unless the time is extended for an additional period not to exceed 30 days by the Supreme Court for good cause shown. Such review by the Supreme Court shall have priority over all other cases and shall be heard in accordance with the rules promulgated by the Supreme Court." Fla.Stat.Ann. § 921.141(4). (Emphasis added.)

And mandatory expedited review of the death sentence was also provided for in the statutory scheme adopted by Texas and approved in *Jurek v. Texas,* supra:

"The judgment of convictions and *sentence of death shall be subject to automatic review* by the Court of Criminal Appeals within 60 days after certification by the sentencing court of the entire record unless time is extended an additional period not to exceed 30 days by the Court of Criminal Appeals for good cause shown. Such review by the Court of Criminal Appeals shall have priority over all other cases, and shall be heard in accordance with rules promulgated by the Court of Criminal Appeals." Tex.Code Crim.Proc., Art. 37.071(f). (Emphasis added.)

In Montana, there is no mandatory review of a death sentence. In fact, there were no statutes in existence providing for mandatory expedited review. The majority simply concluded that the general appeal statutes which apply in all criminal cases were sufficient in combination with *State v. Simtob,* (1969), 154 Mont. 286, 462 P.2d 873 and the statutes relating to sentence review. It is interesting to note the majority did not quote from these statutes, because if they did, they would have to know that the statutes are manifestly deficient. I again must conclude the majority did not bother to read the statutes upon which they rely.

In concluding that the appeal and sentence review processes satisfied the third requirement enunciated in *Gregg, Proffitt* and *Jurek,* the majority stated.

"Prompt judicial review of death sentences is provided for by appeal to this Court as well as review to the Sentence Review Division. *This Court determines the legality of the sentence imposed, State v. Simtob,* (1969), 154 Mont. 286, 462 P.2d 873, while the Sentence Review Division is designed to determine the appropriateness of the sentence with respect to the individual offender and particular offense. This satisfies the third criteria.

"* * * There is appellate review at two levels, insuring that the sentence is both legal and proportional to the nature and class of crime. * * *" (Emphasis added.)

The only accurate statement is that which I have emphasized, and that is only accurate to a minor extent in terms of the application of *Simtob* to the facts of this case.

There is no provision in any statute which specifically allows review of the death sentence itself, and there are no provisions in the statutes which allow for appellate review of sentences. The majority has simply applied the general statutes which apply in criminal cases and conclude that they are sufficient, again without quoting from the statutes or otherwise providing any explanation of their adequacy.

The general appeal statute, section 95-2401, R.C.M. 1947, specifies that appeal is the sole method of review in criminal cases:

"(a) This chapter shall govern review in all criminal cases.

"(b) All existing methods of review in criminal cases in the state are abolished. Hereafter the only method of review in criminal cases shall be by notice of appeal."

Those orders and judgments from which a defendant in a criminal case may appeal are provided for in section 95-2404, R.C.M. 1947:

"(a) An appeal may be taken by the defendant only from a final judgment of conviction, and orders after judgment which affect the substantial rights of the defendant.

"(b) Upon appeal from a judgment, the court may review the verdict or decision, and any order or decision objected to which involves the merits, or necessarily affects the judgment."

Obviously, this statute does not provide for review of a death sentence in and of itself. In fact, it is doubtful that this statute was intended to cover an appeal where the defendant seeks only review of the death sentence.

The time limits for taking an appeal are set out in section 95-2405(e), R.C.M.1947, which provides:

"(e) An appeal from a judgment may be taken within sixty (60) days after its rendition."

If an appeal is not taken within sixty days of its rendition, a defendant may lose any right to have the supreme court hear his appeal. If a defendant does not show good cause in not filing his appeal within sixty days, his appeal is subject to summary dismissal. *State v. Frodsham*, (1961), 139 Mont. 222, 362 P.2d 413, 418. Accordingly, if defendant fails to timely file his notice of appeal he may lose his right to appeal. This is in sharp contrast to those statutes approved in Georgia, Florida and Texas, where the defendant cannot be sentenced to death unless the highest appellate court in the state has reviewed the death sentence. There, review is mandatory.

The other review relied on by the majority, sentence review by the Sentence Review Division, is a pure figment of their imagination insofar as it applies to the death penalty. Whatever the philosophy behind setting up the Sentence Review Division, a reading of the statutes shows it was not intended to apply to the review of a death sentence.

Sentence review was created by the legislative in 1967 (Title 95, Chapter 25, Revised Codes of Montana) and there are four statutes involved. The method of appointing the judges to sit on the Sentence Review Division, the number of judges needed to reach a decision, and the place and times of meeting are specified in section 95-2501, R.C.M.1947, which provides:

"The chief justice of the supreme court of Montana shall appoint three (3) district judges to act as a review division of the supreme court and shall designate one of such judges to act as chairman thereof. The clerk of the Montana supreme court shall record such

appointment and shall give notice thereof to the clerk of every district court. This review division shall meet at least four (4) times a year or more as its business requires as determined by the chairman. The decision of any two (2) of such judges shall be sufficient to determine any matter before the review division. No judge shall sit or act on a review of a sentence imposed by him. In any case in which review of a sentence imposed by any of the judges serving on the review division is to be acted on by said division, the chief justice of the supreme court of Montana may designate another judge to act in place of such judge. The *review division shall hold its meeting at Deer Lodge* [the state prison], and may adopt any rules and regulations which will expedite their review of sentence. The division is also authorized to appoint a secretary and such clerical help as it deems adequate and fix their compensation." (Emphasis added.)

The procedure for obtaining sentence review is contained in section 95-2502, R.C.M.1947, which provides:

*"Any person sentenced to a term of one (1) year or more in the state prison by any court* of competent jurisdiction may, within sixty (60) days from the date such sentence was imposed, except in any case in which a different sentence could not have been imposed, file with the clerk of the district court in the county in which judgment was rendered, an application for review of the sentence by the review division. Upon imposition of the sentence the clerk shall give written notice to the person sentenced of his right to make such a request. Such notice shall include a statement that review of the sentence may result in decrease or increase of the sentence within limits fixed by law. The clerk shall transmit such application to the review division and shall notify the judge who imposed the sentence, and the county attorney of the county in which the sentence was imposed. Such judge may transmit to the review division a statement of his reasons for imposing the sentence, and shall transmit such a statement within seven (7) days, if requested to do so by the review division. The review division may for cause shown consider any late request for review of sentence and may grant such re-

quest. *The filing of an application for review shall not stay the execution of the sentence.*" (Emphasis added.)

We have already seen that the appellate review in Montana is not mandatory, and could be lost entirely if notice of appeal is not timely filed. The same is true of sentence review — it is not mandatory — it is available only if a defendant requests it within sixty days of being sentenced. (Section 95-2502.) For this reason alone these statutes cannot meet the demands of *Gregg, Proffitt* and *Jurek.* But even assuming that mandatory review is not required, the statutes still provide no solace to a defendant sentenced to death — for the simple reason that by their very terms they do not apply to a person sentenced to death.

.The first sentence of section 95-2502 provides that sentence review is only available to "any person sentenced to a term of one (1) year or more in the state prison". Obviously, a death penalty cannot fulfill that requirement. Moreover, the last sentence of section 95-2502 forecloses any application of sentence review to a death sentence: "The filing of an application for review shall not stay the execution of the sentence."

Moreover, the statute providing for the method, time and place of execution, section 95-2303, R.C.M.1947, provides in relevant part:

"(a) The punishment of death must be inflicted by hanging the defendant by the neck until he is dead.

"(b) In pronouncing the sentence of death, the court shall set the date of execution which must not be less than thirty (30) days nor more than sixty (60) days from the date the sentence is pronounced.

"(c) A sentence of death must be executed within the walls or yard of a jail or some convenient private place in the county where the trial took place."

By this statute, if the sentence is death, the defendant is not committed to prison but remains in jail until he is executed. And the execution must take place no less than thirty days and no more than sixty days from the time sentence is passed. This cannot be reconciled with section 95-2502, which provides that "the filing of

an application for review shall not stay the execution of the sentence." One does indeed wonder how a person under a sentence of death can be first executed and later entitled to sentence review. And this is the remedy the majority says is adequate.

The remaining statutes are additional proof that the Sentence Review Division was not intended to review a sentence of death:

"The review division shall, in each case in which an application for review is filed in accordance with 95-2502, review the judgment so far as it relates to the sentence imposed, *either increasing or decreasing the penalty*, and any other sentence imposed on the person at the same time, and may order such different sentence or sentences to be imposed as could have been imposed at the time of the imposition of the sentence under review, *or may decide that the sentence under review should stand.* In reviewing any judgment, said division may require the production of presentence reports and any other records, documents or exhibits relevant to such review proceedings. The appellant may appear and be represented by counsel, and the state may be represented by the county attorney of the county in which the sentence was imposed. If the review division orders a different sentence, the court sitting in any convenient county shall resentence the defendant as ordered by the review division. Time served on the sentence reviewed shall be deemed to have been served on the sentence substituted. *The decision of the review division in each case shall be final and the reasons for such decision shall be stated therein.* The original of each decision shall be sent to the clerk of court for the county in which the judgment was rendered and a copy shall be sent to the judge who imposed the sentence reviewed, the person sentenced, the principal officer of the institution in which he is confined and the decision shall be reported in the Montana Reports." (Emphasis added.)

The language that the Sentence Review Division can either "increase or decrease the sentence" is a clear indication that the legislature had in mind a prison sentence rather than a sentence of death. Moreover, there is no appeal from the decision of the Sentence Review Division as the statute specifically provides that "the

decision of the review division in each case shall be final". The statutes involved in *Gregg*, *Proffitt* and *Jurek* provided mandatory review by the state's highest appellate court.

The wording of the last statute on sentence review, section 95-2504, R.C.M.1947, clearly indicates that a sentence of death is not included in the review process. It provides:

"A person who on the effective date of this act is imprisoned under a sentence to the state prison and who is not eligible for parole may, *notwithstanding the partial execution of such sentence*, file for a review of such sentence and of any other sentence imposed at the time; provided, *that at the time of such request for review such person shall execute a written consent to such sentence as may be imposed by the review division on such review, including an increased term.* No such application shall be considered if taken later than two (2) years after the effective date of this act nor in any case in which a different sentence could not have been imposed." (Emphasis added.)

The emphasized language again indicates the sentences to be reviewed are prison sentences and not death sentences. The plain meaning of this statute is that if a person has been sentenced to prison, and even if he has partially served his sentence, he may still apply for sentence review provided he signs a consent form that he is willing to take the chance that his sentence may also be increased. This language surely indicates the legislature was not contemplating the death penalty when they enacted the sentence review statutes. To hold that the sentence review statutes apply to a death sentence is to ignore the plain meaning of the statutes. The tortured reasoning of the majority does not square with the facts.

The action taken by the 1977 legislature in response to *Gregg*, *Proffitt* and *Jurek*, by enacting a comprehensive death penalty sentencing hearing procedure and appellate review procedure (sections 95-2206.6 through 95-2206.15, R.C.M.1947), is proof the legislature regarded the statutes approved by the majority here as woefully inadequate. The statutes enacted include mandatory sentencing hearings to consider issues of aggravation or mitigation and mandatory appellate review.

The hearing required where there is a conviction that may result in a death sentence, is provided in section 95-2206.6, R.C.M. 1947:

"When a defendant is found guilty of or pleads guilty to an offense for which the sentence of death may be imposed, the judge who presided at the trial or before whom the guilty plea was entered *shall conduct a separate sentencing hearing to determine the existence or nonexistence of the circumstances set forth in 95-2206.8 and 95-2206.9* for the purpose of determining the sentence to be imposed. The hearing shall be conducted before the court alone." (Emphasis added.)

Under this statute a sentencing hearing is mandatory, and the court must inquire into the existence or nonexistence of aggravating circumstances as enumerated in 95-2206.8 and the existence or nonexistence of mitigating circumstances as enumerated in section 95-2206.9. These statutes provide:

"Aggravating circumstances are any of the following:

"(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.

"(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.

"(3) The offense was deliberate homicide and was committed by means of torture.

"(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.

"(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.

"(6) The offense was deliberate homicide as defined in subsection (1)(a) of 94-5-102 and victim was a peace officer killed while performing his duty.

"(7) The offense was aggravated kidnapping which resulted in the death of the victim." Section 95-2206.8, R.C.M. 1947.

"Mitigating circumstances are any of the following:

"(1) The defendant has no significant history of prior criminal activity.

"(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(3) The defendant acted under extreme duress or under the substantial domination of another person.

"(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

"(5) The victim was a participant in the defendant's conduct or consented to the act.

"(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.

"(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.

"(8) Any other fact exists in mitigation of penalty." Section 95-2206.9, R.C.M.1947.

The procedure for hearing evidence at the sentencing hearing is specifically set forth in section 95-2206.7, R.C.M.1947, which states:

"In the sentencing hearing, evidence may be presented as to any matter the court considers relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court considers to have probative force may be received regardless of its admissibility under the rules governing admission of evidence at criminal trials. Evidence admitted at the trial relating to such aggravating or mitigating circumstances shall be considered without reintroducing it at the sentencing proceeding. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death."

After receiving the evidence at the sentencing hearing, section

95-2206.10, R.C.M.1947, provides that manner in which the District Court may consider the aggravating and mitigating circumstances in making his decision as to whether the death penalty should be imposed:

"In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances enumerated in 95-2206.8 and 95-2206.9 and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 95-2206.8 exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense."

Moreover, before a court can impose a death penalty it must make specific findings of fact as required by section 95-2206.11, R.C.M.1947:

"In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact as to the existence or nonexistence of each of the circumstances set forth in 95-2206.8 and 95-2206.9. The written findings of fact shall be substantiated by the records of the trial and the sentencing proceeding."

And if a death penalty is imposed, automatic review is mandated by section 95-2206.12, and the nature and extent of appellate review is provided by sections 95-2206.13, 95-2206.14, and 95-2206.15, R.C.M.1947. The automatic review statute provides:

"The judgment and sentence of death are subject to automatic review by the supreme court of Montana as provided for in 95-2206.13 through 95-2206.15." Section 95-2206.12, R.C.M.1947.

The time limits within which review must take place and the priority assigned to review of a death sentence is set forth in section 95-2206.13:

"The judgment of conviction and sentence of death are subject to automatic review by the supreme court of Montana within 60 days

after certification by the sentencing court of the entire record unless the time is extended by the supreme court for good cause shown. The review by the supreme court has priority over all other cases and shall be heard in accordance with rules promulgated by the supreme court. The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration."

The duties of the clerk of court to transmit the entire record to the supreme court is specified in section 95-2206.14:

"The clerk of the trial court, within 10 days after receiving the transcript, shall transmit the entire record and transcript to the supreme court."

And last, the nature and extent of appellate review in the supreme court is also specifically spelled out:

"The supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine:

"(1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

"(2) whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating circumstances enumerated in 95-2206.8 and 95-2206.9; and

"(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration." Section 95-2206.15, R.C.M.1947.

The above statutes show a good faith attempt by the 1977 Montana legislature to comply with the mandates of *Gregg, Proffitt* and *Jurek*. Procedural protections are mandated through the entire process of hearing and appellate review. On the other hand, the statutes which this Court has approved as being constitutional, fail in every respect. One can only conclude that the nature and circumstances of the crimes involved in this case has had more influence on the majority than their desire to follow the law. The statu-

tory scheme approved by the majority cannot possibly withstand a careful analysis by the United States Supreme Court.

For the foregoing reasons I would reverse the convictions and grant a new trial, ordering that the illegally seized evidence must be suppressed. In addition, I would hold that Montana's death penalty statutes in existence at the time are unconstitutional. No appellate court should give its stamp of approval to the violations of defendant's rights which occurred in this case. But this Court has accomplished this objective by a total disregard for the facts. The misstatement of the facts is something that I cannot fathom. Nor should any appellate court resort to the tortured reasoning of the majority in upholding the constitutionality of Montana's death penalty statutes. If this is the standard by which all review is to be conducted, then I see no reason at all why appellate courts should exist. Let each district judge be the final law unto himself.